[No. S024833. July 2, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WADE FARLEY, Defendant and Appellant.

Counsel

Ezra Hendon, under appointment by the Supreme Court, and David L. Saine for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Ronald S. Matthias, Nanette Winaker and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—A jury convicted defendant Richard Wade Farley of the first degree murders of Joseph Silva, Wayne Williams, Glenda Moritz, Ronald Reed, Helen Lamparter, Ronald Doney, and Lawrence Kane (Pen. Code,[1] §§ 187, 189), the attempted murders of Greg Scott, Richard Townsley, Randell Hemingway, William Drake, and Karen Mackey (§§ 187, 664), assault with a firearm upon Laura Black (§ 245, subd. (a)(2)), second degree burglary (§ 459; former § 460, subd. (2), now § 460, subd. (b)), and felony vandalism (former § 594, subd. (b)(1)). The jury found true the special circumstance allegations that six of the murders were committed while defendant was engaged in the commission or attempted commission of a burglary (§ 190.2, subd. (a)(17)(vii), now § 190.2, subd. (a)(17)(G)), and that defendant was convicted of at least one crime of first degree murder and one or more crimes of first or second degree murder. (§ 190.2, subd. (a)(3)). The jury also found true the allegations that all five counts of attempted murder were willful, deliberate, and premeditated (§ 664, subd. (f)), the allegations pertaining to all counts of murder and attempted murder that defendant personally used a firearm (§§ 1203.06, 12022.5, subd. (a)), and the allegations regarding defendant's personal infliction of great bodily injury on Scott, Townsley (§§ 12022.7, 1203.075), and Black (§ 12022.7). Following the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's motion for a new trial (§ 1181), and the automatic application for modification of the verdict (§ 190.4, subd. (e)). The court entered a judgment of death and also imposed sentence on the noncapital offenses. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

[1] All further undesignated statutory references are to the Penal Code.

## I. Factual Background

### A. Guilt phase evidence

#### 1. Prosecution evidence

##### a. Summary

In 1984, while employed at Electromagnetic Systems Laboratory (ESL) in Sunnyvale as a computer technician, defendant became obsessed with coemployee Laura Black. His unwelcome pursuit of Black, and his belligerent and threatening responses to ESL's attempts to stop his harassment of her, led to his termination from ESL in 1986. He continued stalking and harassing Black, and threatened violence against others. In 1988, Black obtained a temporary restraining order (TRO) against defendant. During the approximately two-week period between the issuance of the TRO and the date scheduled for a hearing regarding a permanent injunction, defendant purchased a semiautomatic shotgun and large amounts of ammunition, visited shooting ranges to practice, and put his affairs in order. On February 16, 1988, the day before the scheduled court hearing, he went to the ESL facility where he had worked, shot and killed seven people, and wounded four others, including Black. At trial, defendant conceded responsibility for the seven deaths, but claimed the shootings were not premeditated, and that defendant "did not go to ESL to injure people or to destroy anything."

##### b. Events prior to February 16, 1988

Laura Black testified concerning defendant's efforts to establish a personal relationship with her. She recalled that they met in the spring of 1984. Soon thereafter, defendant invited her to socialize with him, but she declined. Defendant continued to extend social invitations to her without success, to call her on the telephone, to leave her gifts, and to attend her aerobics classes and company softball games. Black testified that she changed her residence three times between July 1985 and February 1988, but defendant obtained her new address each time, and surreptitiously obtained a key to one of these residences. Between the fall of 1984 and February 1988, she received approximately 150 to 200 letters from defendant, including two letters he sent to her parents' home in Virginia where she was visiting in December 1984. She had not provided him with her parents' address.

Various employees of ESL attempted to stop defendant's harassment of Black, and defendant reacted either defiantly or by threatening to commit violent acts. Jean Tuffley, who was employed in ESL's human resources department, testified that she met with defendant in October 1985 regarding

Black's complaints of harassment. Defendant agreed at the meeting to cease sending letters and gifts to Black, following Black home, and using her computer terminal, but in December 1985 he again wrote to Black, threatening to visit her and her roommate. Tuffley testified that she and defendant's supervisor, Charles Lindauer, met with defendant in December 1985 and January 1986, and ESL issued defendant a written warning after each meeting.

After the January 1986 meeting with Tuffley and Lindauer, defendant confronted Black at her residence's parking lot. Black testified that defendant mentioned guns, told her he no longer was going to ask Black what to do and said he was going to tell her what to do. Black further testified that the weekend after this encounter, she received a letter from defendant stating he would not kill her, but referencing "a whole range of options, each getting worse and worse." The letter warned, "I do own guns and I'm good with them," and asked her not to "push" him. It indicated that if neither of them yielded, "pretty soon I crack under the pressure and run amok destroying everything in my path until the police catch me and kill me." It also stated, "You know I'm serious when I show you a letter like this."

In mid-February 1986, Tuffley testified, defendant stopped by her office and told her that ESL had no right to control his relationships with other individuals. Tuffley responded that sexual harassment is illegal, and that if defendant did not leave Black alone, his conduct would lead to his termination. Tuffley testified that defendant calmly said, "if we terminated him . . . he'd have nothing to live for, and that he had guns and he wasn't afraid to use them, and . . . it would be over for him and he'd take people with him." Tuffley asked, "Rich, are you saying that you would kill me?" Defendant said, "Yes, but I would take others too." Tuffley spoke to her supervisor, John Allen about her meeting with defendant and her fear of what he might do. Thereafter, Tuffley explained, she did not interact with defendant; instead, Allen communicated directly with defendant.

In late February or March 1986, Evor Vattuone, an ESL laboratory manager, met with defendant at defendant's request. Vattuone testified that defendant was concerned about the possibility that Black would obtain a restraining order. Vattuone told defendant he understood defendant had been bothering Black, and it would be good if defendant stopped. Defendant told Vattuone he had every right to see Black anywhere, and described following Black home, driving by her home, and attending her softball games. Vattuone told defendant this conduct was jeopardizing his job, and that Black was on "the verge of getting a restraining order." Defendant said he would be very upset if he received a restraining order, and did not know how he would respond. Vattuone testified that he asked defendant what he meant, and

defendant said, "he had guns and he wasn't afraid to use them." Vattuone understood that defendant was telling him he was ready to use guns, and he was going to get his own way "no matter what."

In March or April of 1986, Lloyd Bass, defendant's supervisor at ESL, told Dennis Elliott, defendant's former supervisor at ESL, that Bass had a problem with defendant leaving his work area and "chasing some girl." Elliott testified that Bass asked him to speak to defendant. A few days later, Elliott told defendant he had learned that the human relations department was involved in a situation in which defendant was " 'hassling' a girl over at [ESL building] M-5 during working hours." Elliott told defendant that "it could cost him his job, it could cost him his clearances . . . . He needed to be at his duty station and he should just do his job." Elliott testified that defendant was "really angry" and claimed, "I don't care. They can't hurt me. I'm not afraid of them."

On May 2, 1986, ESL terminated defendant's employment, effective immediately. Following his termination, defendant continued to write and place telephone calls to Black and to attend Black's softball games and aerobic classes, and he frequently was seen in or near the ESL parking lot. At the end of the summer or early fall of 1986, defendant began dating Mei Chang, but he continued to harass Black. On July 10, 1987, he wrote to Black, warning her not to obtain a restraining order. His letter stated, "It might not really occur to you how far I'm willing to go to upset you if I decide that's what I'm forced to do." In early October 1987, he wrote to Black, "I've nothing else to lose now but my life, so don't try pushing me any further."

In November 1987, Thomas Burch, a longtime friend who had worked with defendant at ESL, spoke with him. Burch testified that defendant was upset and worried, but not depressed. Defendant told Burch that he owed the Internal Revenue Service (IRS) between $25,000 and $30,000 and that the IRS was about to attach his wages.[2] He also said that if the IRS was not willing to "give him some slack, that he didn't have anything or he didn't have much to live for." Defendant brought up the shooting massacre at a McDonald's restaurant in San Ysidro, and said, "I wonder what they would do or what they would think if I did something like that." Burch interpreted "they" to mean ESL, and did not take defendant seriously.

That same month, defendant wrote to Black, warning, "This is going to escalate," because, he believed, she thought he was "a joke." He advised her not to show his letters to anyone, because they might "do something stupid

---

[2] In October 1987, defendant began working at Covalent Systems (Covalent).

which would make me do something stupid and it would spiral beyond any hope of recovery." In December 1987, he asked in a letter to Black, "[D]o you believe I can make you pay attention to me?"

That same month, the topic of "shoot[ing] up" ESL was discussed during a conversation defendant had at a delicatessen with Gerald Hirst and homicide victim Lawrence Kane. Hirst believed he was being forced to resign from ESL, and the three men discussed ESL's management practices. Hirst testified that defendant inquired whether "his girlfriend" Black was still at ESL and where her office was located, and Kane provided him with directions. The conversation returned to ESL's management, and Hirst said, "What's it going to take to wake them up, some madman to come in there to shoot the computers, shoot the place up?" Hirst testified that as he left the table to get more coffee, he heard defendant say, "I might do it." When Hirst returned, Kane asked him whether the glass in the ESL Mardex security doors was bulletproof. Hirst said he did not think so. Defendant said, "Then double-aught buck would take care of that glass, wouldn't it?" Hirst agreed. According to Hirst, the three of them "fantasized and laughed and joked, about how funny it might be to go in [to] the company and shoot up the equipment." Hirst was interested in investigating job opportunities at defendant's current employer, and gave defendant directions to his office at ESL.[3]

In January 1988, ESL employee Robert Peterson confronted defendant, who was parked outside of ESL, and asked him to stop harassing Black. Peterson testified that he told defendant something to the effect, "If you continue doing this, you may have to go to jail." Defendant responded that Peterson was "only making things worse." On January 23, 1988, approximately three weeks before the attacks, Black received a letter from defendant describing his encounter with Peterson and instructing her, "You'd better tell him to mind his own business. . . . [¶] He doesn't have any idea what he's getting into. You'd better tell him, I'd better never see any police around me."

On February 2 or 3, 1988, Black obtained a TRO against defendant. The hearing regarding a permanent injunction was scheduled for February 17, 1988, the day after the crimes were committed. Black also sought $1,000 in attorney fees. Black's attorney, Mary Bird, and Bird's receptionist and office manager, Ruth Day, testified that on or about February 9, defendant delivered a letter to Bird, claiming that, contrary to the declaration supporting the TRO, he had a relationship with Black. He claimed to possess proof of this relationship, such as photographs of Black and defendant on dates, a garage door opener to Black's house, and hotel and credit card receipts. On February

---

[3] Hirst left his employment at ESL on January 8, 1988. On February 16, 1988, the day the crimes were committed, his office was occupied by homicide victim Wayne Williams, whose body was found inside the office. Williams shared the office with homicide victim Kane.

10, 1988, Bird prepared a notice in lieu of subpoena, requiring defendant to bring these items to court on February 17.

In the meantime, defendant visited Bighorn Sporting Goods and asked Frank Janik, the store manager, to see something with "high-capacity fire power." Janik further testified that approximately one week later, on February 11, defendant returned to the store and purchased a Benelli riot configuration semiautomatic shotgun and ammunition. He paid by check, which later was returned for insufficient funds. According to Janik, defendant was "very calm" when he purchased the weapon. The same day, according to David Walker of Target Masters West, defendant rented a shooting lane at the shooting range, requested six silhouette or "man-shaped" targets, and purchased 13 boxes of shotgun and pistol ammunition. Walker further testified that the next day, defendant purchased 1,000 rounds of .357 magnum handgun ammunition, one box of nine-millimeter hollow-point handgun ammunition, and three boxes of .380 hollow-point handgun ammunition.

Approximately one week before the commission of the crimes, defendant spoke to Carolyn Gagnon, a secretary for Father Rewak, the president of Santa Clara University, where Black was enrolled. Gagnon testified that defendant provided his name, and insisted upon seeing Father Rewak. Gagnon told defendant that Father Rewak was not in, and asked him whether he wished to leave a message. Defendant declined, stating it did not matter anyway, because Father Rewak was always going to remember his name. Gagnon testified that defendant was cocky when he said this, and displayed a sarcastic smile.

Anthony Thurman of Homes Away From Home testified that on February 12, four days before the commission of the crimes, defendant visited the business and discussed renting a motor home. Defendant returned that afternoon to fill out rental forms. Catherine Mary Evangelista, the personnel supervisor for defendant's employer, Covalent, testified that, also on February 12, defendant eliminated Black as a beneficiary of two life insurance policies, and made Mei Chang the sole beneficiary. Defendant was adamant the change had to be completed that day.

Chang testified that very shortly before defendant was arrested, she and defendant rented a storage locker in Chang's name. Defendant and a friend, Jerome Kaercher, moved some of defendant's belongings to a storage locker on either February 14 or 15. Kaercher testified that defendant "seemed extremely happy." That same weekend, defendant moved belongings from the home of Lora Glaser, a former rental property that he had vacated in October 1987. Glaser testified that defendant seemed "upbeat, busy, productive, like he was getting something done."

On February 15, defendant was seen by off-duty Santa Clara County Deputy Sheriff Larry Imas at the Santa Clara County public shooting range, where Imas was employed on a part-time basis. Imas testified that defendant asked to purchase .22-250 ammunition, but there was none in stock. The same day, defendant completed the paperwork for the motor home he had rented, and took possession of it. Thurman testified that defendant did not behave out of the ordinary on this last visit to Homes Away From Home. He also testified that defendant's check for the rental subsequently was returned for insufficient funds. San Jose State University Professor John Avila, Jr., testified that on the evening of February 15, defendant told him that he was going to Southern California and would not be in class on Wednesday, February 17.

### c. *Events on February 16, 1988*

On Tuesday February 16, 1988, at approximately 8:00 a.m., defendant entered the accounting department of Covalent and asked for his paycheck. Linda Emerson, the accounting manager, testified she told defendant the checks would be available at 10:00 a.m. When defendant was asked why he needed his check at 8:00 in the morning, he replied that "he had to go buy a gun." Early in the afternoon, defendant visited the Santa Clara County public shooting range. Imas testified that he mentioned to the range owner and the supplier that defendant had been looking for .22-250 ammunition, and defendant showed them he had since acquired several boxes of the ammunition.[4]

About 2:50 p.m., defendant arrived in the Coachman motor home at ESL's offices in Sunnyvale. He walked to ESL's two-story M-5 building with a shotgun in his hands, rifles strapped over his body, and approximately four bandoliers of ammunition strapped to his body. He shot and killed ESL employee Lawrence Kane in the parking lot. He then fired at Randell Hemingway, who safely ducked behind his car door. Defendant shattered glass in the Mardex security doors to M-5 by firing one of his weapons. Inside the building, he shot and killed six persons and wounded four others, including Black. The precise sequence of events is unclear, but the evidence established that defendant generally walked slowly and deliberately through the building, shooting his victims at various locations in the facility. In addition to committing these assaults, defendant fired at computer equipment and parts of the building.[5]

---

[4] According to Janik, on or shortly before February 16, defendant visited Bighorn Sporting Goods for a third time and purchased more ammunition for a shotgun and a rifle.

[5] ESL was paid $1.6 million on its insurance claim, which included, among various items, equipment damage of $336,790, physical plant damage of $68,355, and associated internal costs to ESL of $40,929.

The first report of the incident to a 911 operator was received at 2:53 p.m. At approximately 3:15 p.m., a man identifying himself as Richard Farley placed a call on an inside emergency telephone line. He told Robert Mancebo, an ESL security hardware repairperson, "I'm the one who has been wasting all these people." Mancebo testified that defendant also said he was calling "to let us know why he was doing it, and that he wanted a recorder" so there would be a permanent record. Defendant said he was "doing it . . . because of Laura Black and because of her lawyer and what they were doing." Mancebo asked if defendant was going to kill anyone else, and he said no, he was "just shooting up equipment." Defendant terminated the call, but placed a second call on ESL's emergency telephone line a few minutes later. He wanted to talk to the police, but no officers were in the security room at that time. Mancebo and defendant had one or two more separate telephone conversations. During the last call, Mancebo could think of nothing else to say, so he handed the telephone to ESL security officer Devin Matlock. Defendant told Matlock that he had told Black he would do something like this if her attorney obtained a restraining order. Defendant also said he had a high-powered rifle, and that Matlock should keep people 300 yards from the building. Matlock testified defendant did not sound depressed or agitated, but seemed as if he was anticipating that something interesting would be happening.

At approximately 3:20 p.m., facilities engineering manager John Kitching received a call on an ESL emergency telephone line from a man who identified himself as "Rich." The caller said, "Tell Mei Chang I'm sorry. I just got Laura." He also said, "I've got plenty of ammunition. It will all be over at 5 o'clock."

At approximately 3:30 p.m., Captain Albert Scott of the Sunnyvale Department of Public Safety spoke to defendant. Defendant seemed to him to be a "little bit excited." When Scott asked defendant whether he had killed anyone, defendant said he had shot three or four individuals on the top floor but did not know how many were dead. Defendant also said that Black had gone too far and that he had "done this" to make a point. He said she had belittled him, and he was getting even. At one point, Scott asked whether defendant would surrender his guns and come down, and defendant said, "No, I'm not ready yet. I want to gloat a little bit."

At approximately 3:35 p.m., a caller who identified himself as "Rich" told ESL telephone installer Robert Costanzo, who was assisting in answering the telephones, that he had an assault rifle, a shotgun, and some handguns, and enough ammunition—if he fired continuously—to last for two hours. According to Costanzo, the caller was very clear and calm.

During one of defendant's telephone conversations on the afternoon of February 16, Linda Walden, defendant's longtime friend and former landlady, who also worked at ESL, was hiding under the desk at which defendant was standing. Defendant pulled out the chair, and said, "Oh, there's someone here. You can come out now. Oh, it's Linda." When she emerged, he calmly told her she could leave. Christine Hansen, who was hiding nearby, assumed it was the police evacuating the building. She left her hiding place and encountered defendant. She asked, "Can I go, too?" Defendant said, "Yes, you can go." Hansen testified that defendant's tone was "regular," and he was not angry or crying.

Lieutenant Ruben Grijalva of the Sunnyvale Department of Public Safety, an expert in hostage negotiations, negotiated by telephone with defendant from approximately 3:30 p.m. until he agreed to surrender at approximately 8:30 p.m. Defendant terminated the telephone communication with Grijalva several times to prevent the police from tracing the call. The initial portion of the negotiations was not recorded, but Grijalva took notes. According to Grijalva, in the initial conversations defendant was "quite excited," but his voice was not incoherent or slurred. After approximately 30 to 45 minutes, "his demeanor was much more calm, much more deliberate . . . ."

Defendant asked Grijalva to tell Black that her attorney and Bob Peterson had given her bad advice, and that "he was sorry that they weren't there, too." Defendant told Grijalva that he was due to appear in court the next day, that Black had filed a lawsuit against him, and that all he wanted to do was date her. According to defendant, "Had she gone out with him one time, none of this would have happened." He said he had gone to the second floor and shot Black, and he wanted her to live and to remember what had occurred. He said "he knew what he had done was wrong and that he had to die because of it." He constantly spoke of killing himself, or having the police kill him, but expressed fear the police only would wound him, and "he didn't want to suffer."

Grijalva testified defendant "indicated that he was real good with guns" and "had several pistols and a high powered rifle and a shotgun with him." When defendant mentioned target shooting, Grijalva inquired whether he was interested in hunting. Defendant replied, "I'd rather kill people than animals. It's not sporting to shoot animals." When Grijalva asked how many individuals had been shot, defendant said there were "three or four lying around the first floor and that everybody on the second floor was dead." Defendant said he was "not crazy and that he knew what he had done but he had to do it, he had to make a point." He told Grijalva that he almost changed his mind when he arrived at the parking lot, but that "it had to be done and he didn't want Laura Black to think that he was a wimp." He told Grijalva he had thought about doing this when he first received a notice to appear in court.

Defendant asked Grijalva to tell his mother and father he was sorry. He stated he was not sorry he had shot these victims; the only thing he was sorry about was shooting Black, because he wanted her to live and remember what had happened. He also was sorry that "Chuck" (Lindauer), who had terminated defendant's employment, was not there.

Defendant told Grijalva that he did not plan to leave ESL alive, and had changed the beneficiary on his life insurance from Black to Mei Chang. Defendant said he had rented the motor home with a bad check and "thought that was kind of funny." He also told Grijalva that he had brought approximately 1,000 rounds of ammunition and gasoline in the motor home "to blow up ESL," but that when he arrived, he could not carry everything.

At approximately 4:30 p.m., defendant agreed to allow officers to enter the first floor of building M-5 to rescue injured individuals. At some point thereafter, Grijalva's negotiating team obtained a tape recorder and recorded the remainder of the negotiations until defendant surrendered. This recording was played for the jury. Defendant declared, "[T]here's no more reason to harm anybody. I've run out of enthusiasm for things really." Defendant stated that he "shot up a lot of terminals; I guess it's better than shooting people, . . . 'cause it punishes ESL at the same time. . . . I need to get back at somebody, basically."

Defendant said that he told Peterson "he would just cause a lot of trouble . . . and cause Laura to do things . . . she would regret; and this kind of stuff 'cause I tried telling her that, you know, I wouldn't take this. She got me fired and, . . . I wasn't going to let her do anything more to me, really." Defendant told Grijalva, "I never really wanted to hurt her. I just wanted her to know that I was serious and, as I say, if we just could've talked, and we hadn't got this court thing and she didn't try to sue me for $1,000—and then this last letter, you know, that says bring all this stuff: it was just the final straw; I just had it."

Grijalva inquired, "So when you got up today, did you decide today that you wanted to hurt her?" Defendant responded, "I didn't decide that I wanted to hurt her until I got that letter in the mail that said, you know, now you're going to bring this evidence and now we're really going to, you know—I took it as a real threat, where I was [in] real serious trouble now. So until 10 o'clock this . . . morning time, I really hadn't given any thought to hurting her."

Grijalva asked, "When you came down here this afternoon, . . . did you have anybody in mind that you wanted to shoot or just because they were a threat to you?" Defendant said, "They were a threat to me; I wanted to

destroy a lot of equipment at ESL. . . . I came down to destroy, do as much damage to ESL equipment as I could." Grijalva asked, "And you didn't intend or plan on shooting any persons?" Defendant said, "Yeah, some people popped out from around corners and stuff like that, um, and I just shot." Grijalva continued, "Was there anything in particular that you wanted to destroy here at ESL?" Defendant responded, "No, I just want Laura to know I was serious. . . . I wanted to do as much damage to their computer equipment and just cause them a lot of money loss." He later noted, "I'm tired of shooting equipment and I'm tired of shooting terminals. They just explode, spread glass on me. It's not any fun anymore."

Grijalva asked defendant about the victims, inquiring, "Other than Laura, do you know any of the people you shot today?" Defendant responded, "No." Grijalva asked, "So you don't even know them personally?" Defendant confirmed, "I don't know them personally, no. In fact, I have no idea who half of them were. . . . [¶] . . . [¶] I have to tell you, though, that if I'd recognized Peterson, I think I would have shot him, realistically. Because I was pissed at him. I mean, him and [Black's attorney], . . . if they had come into my sights, I would have got them." Defendant described how he "went up to Laura's office, yeah, and then she tried to shove the door thing, so I fired around . . . through the door. And then . . . she fell against it."

Defendant asked whether Black had survived. When Grijalva said he did not know, defendant responded, "I hope she's doing good. . . . [I]f the slug did catch her, or the whatever it was that I hit her with, she can't regret it if she doesn't live. And that was . . . my feelings at the time." During his conversations with Grijalva, defendant never expressed any remorse for the seven individuals killed.

At approximately 8:30 p.m., defendant surrendered to the police after requesting and receiving the promise of a sandwich and a soft drink. Toxicology analysis of his blood did not show the presence of either alcohol or drugs.

Inside M-5, the police discovered a Benelli riot configuration semiautomatic shotgun, a rifle with a scope, a pump-action shotgun, a Sentinel revolver, a Smith & Wesson .357 magnum revolver, a Browning semiautomatic pistol, a Smith & Wesson pistol, a smoke bomb, a leather glove, a belt with pouches filled with ammunition, other bags containing more than 200 rounds of ammunition, and a vest containing more than 800 rounds of ammunition, wooden matches, a foot-long buck knife and sheath, and ear protectors. A search of the motor home found in the ESL parking lot disclosed four gallons of gasoline, a loaded semiautomatic pistol, and more than 2,000 rounds of ammunition. A search of defendant's residence revealed

a Mossberg 12-gauge shotgun barrel, a Ruger .22-caliber carbine, a gun clip, a gas mask, ammunition and empty boxes of ammunition, a reloading press, three cans of gunpowder, and gun-cleaning equipment. Various documents—including the TRO, the notice in lieu of subpoena, and the motor home rental agreement, were on the dining room table. Defendant's will was in plain view on top of a computer terminal.

On February 23, 1988, defendant said to another prisoner, "I think they should be lenient since it's my first offense." After the other prisoner made a comment, defendant replied, "If I did it again, then they should throw the book at me." The tone was conversational, and not joking or agitated.

In March 1988, defendant wrote to Black, "When I go to the gas chamber, I'll smile for the cameras and you'll know that you'll have won in the end." In April 1988, he wrote to Chrysler Credit Corporation, "I'm in jail and will no longer be able to make payments. [¶] I would like the previous bank to know, its harassing letters and failure to allow me to purchase the car were contributing factors to the death of seven innocent people." It was signed, "Rich Farley [¶] mass murderer."

On March 11, 1989, defendant wrote to his friend Tom Burch, "I'm glad Laura's ok. . . . I hope she understands if I'd really wanted to hurt her—she wouldn't be here today."

### 2. *Defense evidence*

#### a. *Defendant's testimony*

Defendant was born on July 25, 1948, at Lackland Air Force Base in Texas. His father was an aircraft mechanic in the Air Force, and his mother was a homemaker. The family moved frequently before settling in Petaluma when he was seven or eight years of age. He graduated from high school and attended one year of junior college. He then enlisted in the Navy in 1967, and served for 10 years. He worked in cryptologic technician maintenance, which involved working with classified electronic systems, and traveled extensively.

In October 1977, upon his discharge from the Navy, he began working for ESL. Initially he was employed at the Sunnyvale facility, and then worked as a field service engineer for five years in Australia. He returned to the Sunnyvale facility in 1984. In the middle of July 1984, defendant met Laura Black and "fell instantly in love with her." Approximately one month later, Black agreed to go to lunch with defendant and his friend Burch. That lunch was defendant's and Black's sole social outing.

Defendant described the steps he took to surreptitiously learn Black's birthday, home address, academic background, residence address, the addresses of her relatives, and her schedule, and how he obtained copies of her office, desk, and residence keys. At the time defendant was obtaining information about Black, he did not believe his actions were wrong. He explained that the environments in which he had worked fostered an attitude that gathering information was not wrong. In the Navy and at ESL, he was granted security clearances, and his access to information gave him a feeling of power. His work in the Navy and in Australia involved spying, and he saw no difference between the government's authority to spy and his ability to spy, so "long as . . . I didn't harm anybody." He developed a sense that, with secret information, "I can, in essence, get away with things that normal people wouldn't be able to get away with. . . . In other words, we go into like a[n] elite society."

Defendant testified concerning his attempts to socialize with Black, and her rejection of him. He testified he made his letters more threatening so that Black would speak to him, but "[a]s I read the letters now, they seem much more intimidating and much more threatening than what I really intended them to be at the time that I wrote them."

Defendant contradicted the testimony of many other witnesses. He denied telling human resources employee Jean Tuffley that if he was terminated he would have nothing to live for, that he had guns and knew how to use them, or that he would take people with him. He claimed he did not threaten Tuffley and others. He asserted he did not tell laboratory manager Evor Vattuone that he had guns and was not afraid to use them. According to defendant, he and Vattuone had spoken about defendant's losing his job, not about restraining orders. He denied that he and Dennis Elliott discussed Laura Black, and denied that Elliott told him that he could lose his job and his clearances. He asserted he was not angry when ESL terminated him, did not know Gerald Hirst, and did not make a reference to the San Ysidro McDonald's massacre when speaking with Tom Burch. He also claimed he was not angry when he received the TRO, although he was annoyed by the request for $1,000 and by the term in the restraining order prohibiting him from going to the fitness center to which Black and defendant belonged. He denied speaking to Carolyn Gagnon or attempting to see the president of Santa Clara University. He also asserted he did not attempt to get his paycheck early on February 16 and did not tell Linda Emerson, the accounting manager, that he needed his check so he could buy a gun.

Defendant also testified concerning some of his activities in the days preceding the commission of the crimes. He sold his Suburban truck on Thursday February 11, placing a sale advertisement the Monday or Tuesday

prior to that date. He claimed he did not visit the Bighorn Sporting Goods store until February 11 and went there to look at paintball shooters.[6] He purchased the Benelli shotgun because "it happened to be there" and because he liked and wanted it. He explained that he moved two guns from a former residence the weekend before committing the crimes, because he wanted to display his gun collection to Black. He stated he bought the ammunition vest a day or so before committing the crimes.

Defendant testified he went to ESL on February 16 to convince Black not to proceed with her legal action against him. He stated he also planned to intimidate Black into entering the motor home and to take photographs of her to demonstrate at the court hearing that he and Black had a personal relationship. He also wanted to show his sizeable gun collection to Black in order to convince her not to appear in court the next day. Defendant agreed with the prosecutor that he wanted Black to believe he would kill persons at ESL if she went through with obtaining the restraining order. Defendant added, however, that his planned demonstration was "just all bluff." He claimed that if none of his plans worked, he planned to kill himself in front of Black.

Defendant testified that after he arrived at ESL, he loaded ammunition in an ammunition vest "to keep myself busy." He stated that he put holstered guns, clip boxes, ammunition pouches, and a knife on his belt because he was bored. Consequently, he testified, he was wearing his ".380 in front, the ammo pouch in front, .357 magnum to my right side, the .22 magnum behind it, a large buck knife behind that, numerous clips around the other side, and my vest, my nine millimeter, my two shotguns, and I tied a cord around the .22-250 and just draped it over me." He recalled that he then put on his left leather glove and earplugs. At this point he did not believe he could go through with talking to Black or taking photographs of her, because that was "not the kind of behavior that I had ever done before," and he agreed with the prosecutor that "it was tougher to take the pictures than to kill myself." He testified that he decided instead to go to Black's office and commit suicide in front of her. He claimed that, other than shooting the front door to gain entrance to ESL's facility, he did not intend to do any damage to ESL or to shoot anyone but himself.

Defendant had a vague recollection of the ensuing events. He recalled that in the parking lot, he saw "somebody behind me with his arm raised, and I remember the gun going off once or twice." He remembered shooting through the Mardex doors. He testified that someone rushed by him and then turned around to come back at him, and he recalled firing repeatedly and the person

---

[6] Mei Chang testified that she accompanied defendant to a paintball event about January 1988, and that he expressed interest in participating.

disappearing. He next remembered being on the landing and becoming aware of someone at the bottom of the stairs. Defendant recalled shooting, adding: "The only thing I'm thinking is to get to Laura's office. These people pop up and I just shoot."

Defendant next remembered being at Black's office. He recalled that her back was to him, and she turned around smiling, but the smile disappeared "as soon as she saw me." Defendant testified he was stunned by the smile, and as he looked at the smile, the gun went off. He "distinctly remember[ed] not having any idea how the thing went off." He testified that the door closed in his face.

Defendant's recall of the ensuing events was fragmented and lacked chronological order. He testified that at some point he watched an armed person walking down the hallway, who apparently was himself. He remembered shooting a door lock, but was not aware of anyone being behind the door. He remembered seeing Linda Walden, his former landlady. He testified that he told her to come out from under the desk, and that she asked whether there was something she could do for him. He told her "no, to get out," which she did. He recalled that another woman asked whether she also could go, and "I told her she could." He testified that he felt he had to move from telephone to telephone because he did not want his calls traced to his location.

Defendant testified he did not know any of the victims except Black. He did not remember shooting any equipment, but did remember seeing that the equipment was damaged. There was, however, no doubt in his mind at trial that he shot the individuals killed on February 16, 1988, and damaged the equipment.

Defendant did not recall many of the unrecorded statements he made while he was inside the M-5 building. With respect to his recorded statement, defendant testified that he repeatedly lied to Grijalva regarding why he went to ESL, in order to avoid being placed in a mental institution. He expressed confusion concerning why he made some incriminating remarks during the recorded statement and gave benign explanations for others. He testified he was not angry at ESL and never wanted to hurt Black.

b. *Expert testimony*

Dr. Charles Raymond Marmar, a psychiatrist and associate professor at the University of California at San Francisco Medical Center, testified for the defense as an expert on the role of stress in dissociative disorders. He did not examine or test defendant, and expressed no opinion regarding defendant's

mental state. Marmar testified that "peritraumatic trans disassociation" refers to disassociation occurring at the time a stressful or traumatic event is taking place. He explained that such dissociative experiences have some or all of the following features: (1) blanking out, or feeling unconnected with the experience, (2) going on "auto-pilot," rather than performing "consciously decided willful acts"; (3) experiencing an altered sense of the passage of time; (4) depersonalizing the experience so that it appears to be happening to someone else; (5) feeling outside one's own body and watching oneself from the outside; (6) perceiving a visual change in one's own body or the physical world; (7) experiencing confusion about what is happening to other individuals and to oneself, for example thinking when a family member is injured that oneself is the person injured; (8) experiencing psychological amnesia, or not remembering all or parts of the experience; and (9) not feeling physical pain from an injury at the time of the trauma. According to Marmar, "[T]he single most important factor that leads people to disassociation is a highly stressful or traumatic life experience." He explained that "the person is faced with catastrophic consequences to themselves and others at the time of the event and . . . [the person's] mind cannot comprehend and fully accept what's happening to them." He testified that a decision to kill oneself can result in such disassociation. He further testified that although struggling with a combination of chronic financial, emotional, and legal stresses generally would not result in disassociation, such struggles might "weaken the person and leave them vulnerable to disassociation." According to Marmar, a person in a dissociative state may not appear bizarre or psychotic, but may seem merely spaced out, a little confused, or highly preoccupied. Marmar explained that the veracity of a person's reported experience of disassociation may be evaluated through interviews with family and friends, as well as through various tests.

### 3. *Rebuttal evidence*

Mark McGinnis testified that on February 11, 1988, he purchased a 1984 Suburban diesel truck from defendant. According to McGinnis, the asking price of $5,000 was "about twenty-five percent of its value." McGinnis looked at the truck, which needed the transmission repaired, and purchased it for $4,500. McGinnis testified that defendant was nervous and fidgety. McGinnis drove the truck for more than two years in conjunction with his business, and then sold it for $9,000.

Richard Newbold testified that he worked with Jean Tuffley for at least five or six years. At some point in the one to three months before Newbold left ESL in mid-April 1986, Tuffley told Newbold that defendant had threatened to kill her. Newbold described Tuffley as "very distraught." According to Newbold, Tuffley was "a pretty level-headed person," and he had not seen her like that previously.

Peri Vattuone was married to Evor Vattuone. She testified that at some point in early 1986, Evor came home from work upset. He said he had just had a long conversation with defendant, who had said things that scared him. Peri testified that one such statement was that defendant possessed guns and knew how to use them, or something to that effect.

B. *Penalty phase*

1. *Prosecution evidence*

The prosecution did not present any additional evidence.

2. *Defense evidence*

a. *From relatives and friends*

Mina Belle Farley, defendant's mother, testified that she married defendant's father in 1947, and they remained married at the time of trial. Defendant's father was an airplane mechanic in the Air Force. They had six children, of whom defendant was the eldest. The family moved frequently, but when defendant was about seven years of age, they settled in Petaluma. His mother described him as a very quiet boy who required little attention from his parents. In high school he was quiet, and did not smoke, drink, or use drugs. His mother testified that he spent much of his time studying, and also played table tennis and chess, enjoyed photography, and baked. His high school grades were "very good," and he graduated 61st out of 520 high school students.

Mina Farley testified that defendant's father spent long periods of time away from the family while he was in the Air Force, but when he was home, he would spend time with the children. She stated that he retired from the Air Force in 1960, and then worked as a school custodian, spending little time with defendant because of his work schedule. According to her, there was much love in the house, but the family displayed little outward affection.

Mina Farley testified that she did not see defendant often after he joined the Navy. In 1973, she and her husband moved to Texas, where they resided at the time of trial. She recalled that defendant visited them in Texas twice between 1973 and 1988, and that the most recent occasion on which she had seen defendant prior to February 16, 1988, was in 1986 or 1987, while she was visiting her daughter.

Defendant's mother also recalled that when defendant was 10 years of age, he helped care for his younger siblings while she was in the hospital and his

father was stationed in Japan. She testified that defendant did not have a bad temper, nor did she ever see him act violently toward his siblings. She stated she was shocked when she heard about the ESL shootings, "[b]ecause that wasn't Rick." She testified she loved him and was proud of the fact that he tried to obtain an education, did not "run around," and did not smoke, consume alcohol, or use illegal drugs.

Gregory Farley, defendant's brother, testified that defendant was nonviolent while growing up. He recalled that when defendant was about 10 years of age, and Gregory was six years of age, Gregory, who could not swim, fell into a swimming pool and defendant rescued him. He also recalled that defendant helped him learn to drive, and sold him a vehicle at a very low price. Defendant's brother described defendant as someone from whom he could seek advice, although he could not recall any specific occasion on which he had done so. Defendant's brother had resided in Germany since 1972, and at the time defendant was arrested he had not seen defendant in 16 years. The brother also stated they never wrote to each other or spoke by telephone. He agreed that he "probably" did not know defendant at all as an adult, and that the person he knew as a child was "totally different" from a person who would commit these crimes.

Lois Eaquinto resided on the same street in Petaluma as defendant when he was growing up, and was close to his mother. She testified that defendant's home was well kept. She stated that defendant's brothers, but not defendant, joined her boys in attending church services. She also stated that defendant's father was absent in the military much of the time, and she could not recall ever having had a conversation with him. According to Eaquinto, when defendant's father was home "everything revolved around him," and defendant and his brothers did not play with Eaquinto's boys during those periods. Eaquinto witnessed little interaction between defendant and his parents, and little reaction by the parents to their children's accomplishments. She also testified that defendant sometimes was "real rough" with his brothers, sitting on them and twisting their arms and stepping on their fingers.

Lois's son, Francis Eaquinto, was the same age as defendant, and they played and attended school together. Francis testified that defendant was the smarter of the two, was more interested in math and science, and was conscientious about his schoolwork. He recalled that defendant's father was strict, but Francis felt welcome at defendant's house when the father was home. Francis had not seen defendant since graduating from high school.

George Duisman grew up on the same street as defendant, and was defendant's best friend when they were teenagers. He testified they played table tennis, chess, and bridge, and enjoyed chemistry and math. According to Duisman, defendant did well in school and was not violent.

Thomas Vail met defendant when defendant was a teenager. Vail testified that defendant was well mannered and had a curious mind. He stated that defendant and Duisman studied bridge, and that defendant was not violent.

Dianne Mahan had at least one class with defendant in high school. She testified that they were not friends socially, and that defendant was quiet and studious.

In defendant's senior year of high school, Paula Stonitsch taught his class in American institutions. Stonitsch testified that although he received a "C" in her class, he was a very good student.

### b. *Defendant's service in the Navy*

Joseph Armas, an expert in the interpretation of military service records and performance evaluations, testified regarding defendant's military record. According to Armas, several tests were administered to defendant during his first three weeks in the Navy. He performed well on the General Classification Test and on tests for mechanical abilities, "electric selection," clerical abilities, arithmetic, sonar, and programming aptitude, but did not do well on the foreign language aptitude test. Defendant volunteered for submarine duty, and after taking extensive psychological and agility tests, was recommended for that duty. He graduated first in his class of six at Naval Submarine School, but did not remain in the submarine program, apparently withdrawing voluntarily. Defendant received high evaluations during his two enlistment periods (1968 to 1971 and 1971 to 1977) and was honorably discharged at the conclusion of each enlistment period.

Kent Wells, a Navy personnel security specialist, testified concerning defendant's work in the military and at ESL. After finishing basic training, defendant was trained to be a "cryptologic technician"—a person who maintains electronic equipment. Wells testified that there were three levels of security clearance, the lowest being "confidential," the middle being "secret," and the highest being "top-secret." Because the Navy's cryptologic function was a highly classified mission, the Office of Naval Intelligence investigated all cryptologic technicians to determine whether they could be granted not only top-secret clearance, but also access to very sensitive "compartmented" information that others with top-secret clearance could access on only a "need to know" basis. The security clearances received by defendant could be granted only to individuals who were found to be trustworthy, reliable, of unquestioned character, and loyal to the government of the United States. The investigation was repeated every five years to check for intervening disqualifying information. Defendant was granted top-secret clearance and access to sensitive compartmented information in November 1968, and throughout his naval career he performed work that required top-security clearances.

Wells further testified that at the time defendant served in the Naval Security Group, the Group's national defense mission was to collect certain intelligence information about adversaries and to disseminate that information to the military and to various intelligence agencies. Defendant contributed to the security of the United States by maintaining the Naval Security Group's equipment, thereby enabling the gathering of information. Wells agreed with defense counsel that, in this context, defendant was "vital to the national defense," testifying that much of defendant's work still was classified at the time of trial. Defendant also maintained equipment that assisted in search and rescue missions for aircraft or ships in distress, and thereby helped to save lives as well as ships and aircraft.

### c. *Defendant's Work at ESL*

Defendant began working at ESL in approximately November 1977, and received a top-secret security clearance from the Department of Defense in March 1978. No background investigation was performed, because defendant had left the Navy so recently, and no subsequent investigation occurred because of funding shortages.

Richard Rose, a Department of Defense contracting officer, testified regarding defendant's work at ESL. ESL specialized in building direction-finding equipment and signal-processing systems for the United States government. Defendant worked in three areas—testing, repair, and preventative and corrective maintenance. From November 1977 through June 1979, defendant was involved in a project concerning the research and development of direction-finding equipment and its installation on ground vehicles and aircraft. The equipment enabled a military commander to determine the location of enemy communication or radar transmitters, and thereby learn the location and strength of enemy forces.

From June 1979 through June 1984, defendant was assigned to the Joint Defense Space Research Facility in Australia. Rose testified that this facility, which was shared by the United States and Australian governments, provided "valuable contributions to the verification of arms control and disarmament agreements." Defendant and others provided round-the-clock maintenance of the electronic equipment, including diagnostic and repair functions. According to Rose, defendant's contribution "could be considered essential in that he was maintaining equipment that was of a significant value to the defense of the United States." Rose also testified that according to the Secretary of Defense, all of the projects on which defendant worked were "vital to the national defense," and disclosure of any of this classified information could, according to the Secretary, result in " 'exceptionally grave harm to the

national defense and public relations of the United States.' " Defendant's four ESL performance evaluations for this work were 99 percent, 96 percent, 96.5 percent, and 98 percent.

From June 1984 until his termination by ESL in May 1986, defendant's work involved feasibility studies for the United States National Security Agency. This project analyzed equipment that might be developed, and how it would function.

### d. *Other mitigating evidence*

Brian Messing, a systems engineer for ESL, worked with defendant in Australia. Messing testified that he considered defendant the best technician at the facility, because he was conscientious about his tasks. According to Messing, defendant took an active interest in his assignments, and "would go out of his way to learn something else about the system." Messing testified that defendant assisted Messing on an occasion when Messing's vehicle ran out of gasoline at night on an isolated stretch of road. Other drivers had passed him by without stopping. Defendant gave him a ride back to the ESL site to obtain gasoline, and then drove him back to his vehicle. Messing also stated that during a conversation on another occasion in Australia, defendant mentioned he owned several guns and a crossbow.

Alcina Sousa knew defendant at San Jose State University. She testified that he always would offer to look at and comment upon computer programs she had written. She also would see him in the hallways helping other students or just being friendly. He did not seem violent to Sousa, but instead very calm. He told Sousa about an incident in which he pulled someone's vehicle out of the snow with his truck. After defendant's arrest, Sousa visited him in jail. She testified that much of their conversation was about her life.

Stanley Hilberg shared a home with defendant from September 1986 to the end of January 1987. He testified that defendant was congenial and very responsible. He also testified that defendant had a shotgun in his room.

Joseph Nielsen, who was 71 years of age, resided on the same street as defendant in late 1987 and early 1988. Nielsen had spoken to defendant on several occasions, and testified he seemed like a very nice young man.

Lynn Clay and Gregory Debord testified that defendant performed well when he was employed at Covalent. Defendant's responsibilities were undertaken in a timely manner, and he provided needed expertise. Clay testified that defendant was patient and responsive when dealing with customers. Debord noted that defendant seemed able to control himself.

Department of Corrections Assistant Director Robert Conroy and Santa Clara County Deputy Sheriff James Teichner testified that while in jail, defendant was courteous and respectful to officers. Conroy further testified that defendant was allowed to use a calculator and a typewriter, which were special privileges. Defendant wrote Conroy a thank you note for providing these materials—unusual action for an inmate to take. Teichner, Deputy Sheriff Jeffrey Hunter, Correctional Officer James Darnell, and Correctional Officer Libby Reynolds testified that defendant did not cause any problems for officers when he was transported from jail to court.

Darnell further testified that while in jail, defendant was selected to be a trustee. This role required an ability to work independently. During the three months Darnell was assigned to defendant's housing unit, defendant did a "great job" working as a trustee.

Reynolds and Judith Pelite, a teacher who provided jail educational services, testified that defendant studied mathematics. Pelite, Reynolds, Hunter, and inmate Wayne Nichols testified that defendant tutored other inmates in mathematics. Nichols further testified that defendant was patient and encouraging.

### 3. Rebuttal evidence

The prosecution presented evidence of defendant's misconduct while in jail. During a May 1990 search of defendant's jail cell, scrubbing pads, used to polish the floors, were found hidden in a paper bag. An infraction report was written. In June 1988, during a search of defendant's cell, a razor blade, two towels, a bag of sugar, 13 books, and 10 magazines were found. It was determined that defendant had committed a minor infraction, and as a penalty he lost use of the sun deck. In March 1989, while defendant was serving as a trustee, he turned off the juice machine to save juice for the trustees, despite having been instructed by an officer to leave it on. He turned the machine on again when ordered to do so, but became agitated. He raised his voice and confronted the officer in front of the other inmates.

## II. DISCUSSION

### A. *Pretrial issues*

#### 1. *Change of venue motions*

Defendant contends the trial court erroneously denied his two motions for change of venue[7] in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We disagree.

##### a. *Factual background*

On July 17, 1989, two years before trial, defendant filed a motion for a change of venue. At the hearing on the motion, held before Judge John Flaherty, defendant produced expert testimony, newspaper articles, and television news reports. On August 21, 1989, the trial court denied the motion without prejudice to its renewal after voir dire. The trial court expressed the view that "this is an extremely close case," and stated that its decision to deny the motion was based in part "on the applicability of the *Hovey* voir dire. . . . I'm satisfied that by the use of that . . . extensive voir dire procedure, that the defendant here can receive a fair trial in this county." (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].)

Almost two years later, on June 13, 1991, after jury voir dire, defendant filed a second motion for a change of venue. The hearing on the second motion was held before Judge Joseph Biafore, the trial judge, on June 26, 1991, the day before the parties were scheduled to exercise peremptory challenges. The court considered the moving papers, the hearing transcript, and the exhibits from the first motion for a change of venue, as well as written and oral arguments and additional exhibits, including newspaper articles, television news reports, and summaries of voir dire responses, received prior to and at the hearing on the second motion for a change of venue. At the conclusion of the hearing, the court announced it would defer ruling on the motion until 12 jurors were chosen, to allow the court to "take a

---

[7] As to this, and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights. In those instances in which he did not present constitutional theories below, it appears either that (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based upon factual or legal standards no different from those the trial court was asked to apply but raise the additional legal consequence of violating the Constitution. "To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time on appeal. (*Ibid.*)

good hard look at those particular people seated in terms of analyzing whether or not the Defendant would, in fact, receive a fair trial from those persons."

Following the selection of 12 jurors, but before they were sworn and before alternates were selected, the court heard further argument, and then denied the motion. The court found that the gravity of the offense, and the nature and extent of the publicity, weighed in favor of granting the motion, but also noted that during voir dire, prospective jurors indicated there was "a spate of media exposure," followed by a decline in news reports. "[M]any of them indicated there was actually nothing they heard about this case until the time for jury selection. . . . [I]n the intervening time, there was not a great mass of media exposure. This case did not generate the type of hysteria that counsel for the defense was talking about." The court also found that the status of the victims and defendant, who were not well known in the community, weighed against granting the motion. The "most salient factor," the court found, was the size of the community. The population of Santa Clara County was large, approaching 1.5 million persons. With respect to the jurors selected, the court had "no doubt that these people will follow the law as instructed by the court." The jurors "exhibited to the court that they can set aside whatever opinions, impressions that they may have derived from the media and judge . . . this case fairly and squarely on the evidence presented in this courtroom." The court found no reasonable likelihood defendant could not receive a fair trial "in this community."

b. *Analysis*

"A trial court must order a change of venue for trial of a criminal case to another county on motion of the defendant 'when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be held in the county.' (§ 1033, subd. (a).)" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1250 [91 Cal.Rptr.2d 211, 989 P.2d 645].) We consider the correctness of the trial court's ruling at the time it was made. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1127 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*), disapproved on different grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11] (*Doolin*).) " 'We will sustain the court's determination of the relevant facts where supported by substantial evidence. We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial.' " (*People v. Hart* (1999) 20 Cal.4th 546, 598 [85 Cal.Rptr.2d 132, 976 P.2d 683] (*Hart*).) "Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: '(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim.' " (*People v. Leonard* (2007) 40

Cal.4th 1370, 1394 [58 Cal.Rptr.3d 368, 157 P.3d 973] (*Leonard*).) "On appeal, a defendant challenging a trial court's denial of a motion for change of venue must show both error and prejudice: that is, that at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and that it was reasonably likely that a fair trial was not had. [Citations.]" (*People v. Davis* (2009) 46 Cal.4th 539, 578 [94 Cal.Rptr.3d 322, 208 P.3d 78].)

We begin with defendant's initial motion, which was made before jury voir dire took place. The first factor of the analysis—the nature and gravity of the offense—weighed in favor of a change of venue for the trial of these seven senseless murders. The same could be said, however, of most capital crimes, and we have concluded that this factor is not dispositive. (*People v. Sanders* (1995) 11 Cal.4th 475, 506 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Indeed, on numerous occasions we have upheld the denial of change of venue motions in cases involving multiple murders. (See, e.g., *Leonard, supra,* 40 Cal.4th at pp. 1395, 1397 [six counts of murder]; *People v. Ramirez* (2006) 39 Cal.4th 398, 407, 434–435 [46 Cal.Rptr.3d 677, 139 P.3d 64] (*Ramirez*) [13 counts of murder]; *People v. Welch* (1999) 20 Cal.4th 701, 721, 744–745 [85 Cal.Rptr.2d 203, 976 P.2d 754] [six counts of murder].)

We next consider the nature and extent of the media coverage, the factor upon which defendant primarily relies. Defendant presented evidence of numerous newspaper articles and television news stories that discussed or mentioned the events, including film of persons being rescued from the ESL building during the siege, pictures of an injured Laura Black, and segments of defendant's recorded statements to Lieutenant Grijalva. He complains that some reports portrayed him as having committed various criminal acts rather than referring to him as a "suspect" or as an "alleged" criminal. He also complains that the media "consistently portrayed [him] as an obsessed, dangerous man."

The media coverage, which decreased over time, was largely factual. (See *Murphy v. Florida* (1975) 421 U.S. 794, 800, fn. 4 [44 L.Ed.2d 589, 95 S.Ct. 2031] [the court has "distinguished largely factual publicity from that which is invidious or inflammatory"]; *id.* at p. 802; *Beck v. Washington* (1962) 369 U.S. 541, 556 [8 L.Ed.2d 98, 82 S.Ct. 955] [the court noted that "[e]ven the occasional front-page items were straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness"]; *Hart, supra,* 20 Cal.4th at p. 599 [noting that the trial court found the reporting to be neutral, not inflammatory, and insufficient to sway public opinion].) Even in a case in which the trial court described the media coverage as " 'saturation,' " we found no error in the denial of a motion for a change of venue,

noting, among other factors, that the "defendant did not show that the media coverage was unfair or slanted against him or revealed incriminating facts that were not introduced at trial." (*Ramirez, supra*, 39 Cal.4th at pp. 434–435.)

■ Defendant asserts, however, that even noninflammatory journalism may warrant a change of venue if the facts are sensational. We have acknowledged that press coverage need not be inflammatory to justify a change of venue (*People v. Tidwell* (1970) 3 Cal.3d 62, 69–70 [89 Cal.Rptr. 44, 473 P.2d 748]), but the cases upon which defendant relies involved additional factors that weighed in favor of a change of venue. In *Tidwell*, two of the victims were prominent members of a small community, the defendants were strangers to that community, and some of the jurors selected to serve knew one or more of the victims or witnesses. (*Id.* at pp. 64–65, 67, 69–75.) Similarly, the change of venue ordered in *Corona v. Superior Court* (1972) 24 Cal.App.3d 872 [101 Cal.Rptr. 411], was motivated by a concern that jurors in a small community, in which the defendant was charged with the murder of 25 migratory farm workers, would be "vulnerable to claims of insensitivity toward migratory farm workers," and conscious "of the community's reputation for peace and security" (*id.* at pp. 875–876, 883). As explained below, such circumstances were absent in the present case.

The remaining three factors—the size of the community, and the status of defendant and of his victims in the community—weighed against a change of venue. Santa Clara County, with a population of almost 1.5 million persons, was a large community. (*People v. Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035] [noting that Santa Clara County in 1988 was the fourth most populous county in the state].) Neither defendant nor his victims were prominent members of this community. Contrary to defendant's contention, the circumstance that defendant, his victims, and many qualified jurors worked in the "high tech" industry did not affect the status of the participants for purposes of the change of venue motion; the terror engendered by defendant's attack stemmed not from its occurrence in a technology company, but from the circumstance that it happened in the middle of the workday in an office setting. Some degree of juror identification with the victims would occur in any venue. (See *People v. Webb* (1993) 6 Cal.4th 494, 515 [24 Cal.Rptr.2d 779, 862 P.2d 779] ["Any sympathetic features of the case would be apparent wherever it was tried."].) For the same reason, defendant's contention that jurors would perceive him as "a 'changeling,' who had turned on and murdered his own kind," does not establish that a change of venue was warranted.

For these reasons, we conclude the trial court did not err in denying defendant's first motion for a change of venue.

As noted above, the court deferred its ruling on defendant's second motion for a change of venue until after jury selection. (See *Maine v. Superior Court* (1968) 68 Cal.2d 375, 380 [66 Cal.Rptr. 724, 438 P.2d 372] [it has long been the practice "to permit the trial court to defer its final ruling on a motion for a change of venue until the jury is empaneled"].) By this point in the proceedings, the trial court had heard on voir dire from the jurors selected that they would decide the case based solely upon the evidence and argument presented in court, and the trial court expressly credited those assertions. (See *Leonard, supra*, 40 Cal.4th at p. 1396 ["jurors selected to try this case bear out the trial court's conclusion that an unbiased jury could be found"].) In addition, none of the sitting jurors or alternates had been challenged for cause. (*Beck v. Washington, supra*, 369 U.S. at pp. 557–558 [the circumstance that the defendant did not challenge for cause any of the jurors selected "is strong evidence that he was convinced the jurors were not biased"].) Nor did defendant exhaust his peremptory challenges, "thus indicating that 'the jurors were fair, and that the defense itself so concluded.' " (*People v. Panah* (2005) 35 Cal.4th 395, 448 [25 Cal.Rptr.3d 672, 107 P.3d 790]; see also *Zambrano, supra*, 41 Cal.4th at pp. 1127–1128 [the court cited the circumstance that the defendant did not challenge any of the sitting jurors for cause or exhaust available peremptory challenges, in support of its conclusion that hindsight demonstrated that retention of the case did not "produce an unfair trial"].)[8]

Defendant relies upon the circumstance that numerous jurors were excused for bias against the defense.[9] The number of excusals may have been more than would occur in an ordinary criminal trial, "but it by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own." (*Murphy v. Florida, supra*, 421 U.S. at p. 803.)

---

[8] Defendant contends he justified his failure to exhaust peremptory challenges by stating in the trial court that although he had eight challenges remaining, the venire included more than eight prospective jurors against whom he had made unsuccessful challenges for cause. He asserts that because it was "futile . . . to try to eliminate all those who had been exposed to prejudicial publicity, he instead tried, in vain, to eliminate those . . . who had expressed an opinion that [defendant] was guilty." Nothing in these circumstances alters the principle that "a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors." (*People v. Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) As noted, defendant fails to identify any sitting juror he challenged for cause. Nor has he shown that "exhausting his remaining peremptories would necessarily have resulted in the seating of a juror who ought to have been removed for cause." (*People v. Price* (1991) 1 Cal.4th 324, 401 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

[9] Defendant asserts 83 prospective jurors were excused for bias against the defense. Below, defense counsel represented that 65 of the 240 prospective jurors who were questioned were excused on the ground that they were biased against the defense. The larger figure apparently includes jurors who were excused pursuant to defense challenge both for bias against the defense and under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*).

■ Defendant also relies upon the circumstance that three years after his commission of the crimes, many prospective jurors still had a recollection of the murders. "The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." (*Patton v. Yount* (1984) 467 U.S. 1025, 1035 [81 L.Ed.2d 847, 104 S.Ct. 2885]; see *Ramirez, supra,* 39 Cal.4th at pp. 434–435 ["Although only one member of the jury indicated . . . he never had heard of the case, they all stated they had not 'formed any opinion as to the guilt or innocence of [the defendant] . . .' and could be fair."].) "We must distinguish between mere familiarity with [the defendant] or his past and an actual predisposition against him." (*Murphy v. Florida, supra,* 421 U.S. at p. 800, fn. 4.) Defendant asserts without citation to the record that four jurors believed he was "guilty," but our review of the voir dire indicates all jurors demonstrated a willingness to set aside any preconceived notions and make their decision solely upon the evidence presented. (See *Beck v. Washington, supra,* 369 U.S. at p. 557 [" 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "].)

■ Defendant further contends, however, that jurors' assertions that they could be impartial should not be credited. "In exceptional cases, ' "adverse pretrial publicity can create such a *presumption* of prejudice in a community that the jurors' claims that they can be impartial should not be believed," [citation] . . . .' [Citation.] 'The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [high] Court has presumed prejudice can only be termed extraordinary, [citation], and it is well-settled that pretrial publicity itself—"even pervasive, adverse publicity—does not inevitably lead to an unfair trial" [citation].' [Citation.] This prejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire." (*People v. Prince* (2007) 40 Cal.4th 1179, 1216 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*).)

In *Prince, supra,* 40 Cal.4th 1179, we reviewed some of the extraordinary cases in which the high court has presumed prejudice from pretrial publicity. "In one case . . . the critical feature was that a local television station in a relatively small community on several occasions broadcast the entire spectacle of the defendant's jailhouse confession. [Citation.]" (*Id.* at p. 1217.) In a second case, " '[t]he trial . . . had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, [in a third case, prejudice] arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is

entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.' [Citation.] The reviewing court instead must look for 'indications in the totality of the circumstances that [the defendant's] trial was not fundamentally fair.' [Citation.]" (*Id.* at pp. 1217–1218.)

The present case does not fall "within the limited class of cases in which prejudice would be presumed under the United States Constitution." (*Prince, supra*, 40 Cal.4th at p. 1217.) The publicity adduced at the second change of venue motion, as at the first, was largely factual and noninflammatory. Nor is there evidence in the record that the jury selection process lacked solemnity. (*Murphy v. Florida, supra*, 421 U.S. at p. 799.) Moreover, the seated jurors, who were questioned on voir dire individually, either recalled nothing of the case or remembered few details. The trial court, which observed the jurors' demeanor, expressly found they had demonstrated an ability to set aside any preconceived impressions derived from the media. Thus, no extraordinary circumstances are presented.

We conclude the trial court did not err in denying the second motion for change of venue.

> 2. *Excusing prospective jurors for cause due to their views concerning the death penalty*

Defendant contends the trial court erroneously excused two prospective jurors for cause based upon their views concerning the death penalty. We disagree.

> a. *Factual background*

> (1) *Excusal of Prospective Juror A.S.*

In Prospective Juror A.S.'s questionnaire, she stated she "Will Consider" the death penalty, and drew an arrow pointing toward the "Oppose" and "Strongly Oppose" responses. She believed that the "penalty should be exercised with great caution. One must be absolutely convinced of the guilt of the accused. He or she must have committed a crime for which they could never be forgiven and which demonstrates a disregard for human life." During voir dire by the court, she stated that "choos[ing] the death penalty would be very difficult for me. . . . [T]he circumstances would have to be very aggravating." She also stated she would be capable of performing the weighing process required to determine the appropriate penalty; she would

listen to all of the evidence and arguments before choosing a penalty; she could make a choice between the penalties, and she would not automatically choose one penalty over another.

When the defense asked whether she could vote for death if she concluded the death penalty was the appropriate punishment, A.S. responded, "I think so." When the prosecutor inquired concerning the hesitancy reflected in her response, she agreed that although she could impose the death penalty on an intellectual level, "emotionally and spiritually" it was more difficult. She explained the basis of her inclination against the death penalty: "I don't think it's right to kill other people. And that doesn't mean that's not justified in very, very unusual cases, but I would not . . . take that lightly. Seems like a very grave issue." She stated she could vote to send a man to his death, but when pressed by the prosecutor to confirm that she could vote for the death penalty, she responded, "I'm not sure I could." The prosecutor asked, "In other words, you don't know whether, if you got to that stage emotionally, then you could actually do it even though intellectually you believed it to be the appropriate decision?" A.S. agreed, "That's true."

The prosecutor challenged A.S. for cause under *Witt, supra*, 469 U.S. 412. Over defense objection, the trial court sustained the challenge, stating, "I believe that the juror was setting the signals early in the voir dire, and she exhibited some difficulty even going through the weighing process, when she had volunteered the concerns about the death penalty as it would affect her ability to go though the weighing process, but we got through that. But I think under these circumstances, that [the prosecutor's] challenge should be granted because I believe that this juror's views would prevent or substantially impair the performance of her duties as a juror in accordance with [the] instructions."

### (2) *Excusal of Prospective Juror R.R.*

In Prospective Juror R.R.'s questionnaire, he circled the "Strongly Oppose" response when asked his view concerning the death penalty. In response to a question regarding the circumstances under which the death penalty was inappropriate, he wrote, "all." During voir dire, he confirmed he was morally, philosophically, and intellectually opposed to the death penalty, but also indicated he understood that if the aggravating circumstances substantially outweighed the mitigating circumstances, he would be required to vote for death. The prosecutor then clarified that the law never would *require* a juror to vote for death. Following this clarification, R.R. stated he "[a]bsolutely" always would vote for life imprisonment without the possibility of parole, and if the aggravating evidence substantially outweighed the mitigating evidence, he "would vote for life" in "[e]very instance."

The prosecutor challenged Prospective Juror R.R. for cause under *Witt, supra,* 469 U.S. 412. Over defense objection, the trial court sustained the challenge, stating, "I think it's abundantly clear after listening to this juror that when he finally realizes he has a freedom of choice after hearing the evidence, and that there is not going to be any directive as to which way he should vote, and the onus is on him and the choice is clearly his, he has indicated in every instance he would vote for life no matter what the evidence is. If given a choice, he would have to vote for life in prison without the possibility of parole."

### b. *Analysis*

"The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties" in accordance with the court's instructions and the juror's oath. (*People v. Smith* (2003) 30 Cal.4th 581, 601 [134 Cal.Rptr.2d 1, 68 P.3d 302]; see *Witt, supra,* 469 U.S. at p. 424.) "The standard of review of the court's ruling regarding the prospective juror's views on the death penalty is essentially the same as the standard regarding other claims of bias. If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 896–897 [22 Cal.Rptr.3d 305, 102 P.3d 228].) "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 [167 L.Ed.2d 1014, 127 S.Ct. 2218].)

A.S.'s statements with respect to her ability to follow the law concerning imposition of the death penalty were equivocal. Although her questionnaire and initial voir dire indicated she could weigh the relevant factors and consider either penalty, her subsequent responses reflected significant hesitation regarding her emotional ability to impose the death penalty. The trial court was in a position, which we are not, to view her demeanor as she responded, and its determination of her state of mind is binding. Substantial evidence supports its ruling that A.S.'s views concerning the death penalty would prevent or substantially impair her performance as a juror.

Contrary to defendant's claim, R.R. did not make it "clear that while he was reluctant to impose a death penalty, he would follow the law." Rather, R.R. struggled with the idea that he would be compelled to impose the death penalty if the aggravating circumstances substantially outweighed the mitigating circumstances. After he was informed he would have a choice

concerning the appropriate penalty under those circumstances, he stated he always would vote for life imprisonment without the possibility of parole, regardless of the evidence. Nor, contrary to defendant's claim, does the record indicate the court and the prosecutor " 'tricked' [R.R.] into disqualifying himself by misrepresenting that a juror could properly take the position that aggravation would never outweigh mitigation enough to warrant a death penalty, and then disqualif[ying] [R.R.] because he took that position." Rather, the prosecutor simply corrected R.R.'s apparent belief that under certain circumstances, a juror would be required to impose the death penalty, and the court properly excused R.R. based upon R.R.'s disclosure that he never would impose the penalty of death.

### 3. *Prosecution challenges for cause*

Defendant claims the trial court erroneously permitted the prosecutor to challenge four prospective jurors on the ground they were biased *against the defense* as a result of pretrial publicity. He contends that the prosecutor had no standing to make the challenges, and that the trial court erred in excusing the prospective jurors for cause. He also asserts that sustaining the challenges impaired his right to counsel under the Sixth, Eighth, and Fourteenth Amendments, and deprived him of a number of peremptory challenges equal to that allotted to the prosecution.

#### a. *Factual background*

##### (1) *Excusal of Prospective Juror L.R.*

On his juror questionnaire, Prospective Juror L.R. wrote "Yes," when asked whether he thought defendant was guilty of the charges. He also stated that he opposed the death penalty. On voir dire, the trial court asked L.R. whether he "would be able to set aside your previous impressions and opinions and judge this matter solely on the evidence produced in this courtroom and on the arguments of the attorneys and on the body of law that the Court will instruct you?" L.R. found the question "very difficult to answer," and stated that "I really don't know how I would behave as a juror since I have never been a juror." The court explained that he was not being asked to forget his opinions and impressions; rather, he would be called upon to set them aside and decide the case based upon what he heard in the courtroom. L.R. said he did not know whether he could do so.

The prosecutor challenged L.R. for cause under *People v. Bittaker* (1989) 48 Cal.3d 1046, 1090 [259 Cal.Rptr. 630, 774 P.2d 659] (*Bittaker*), "because he has not affirmatively said that he can set aside his opinions and deal only with the facts in the case as they are presented in the Court." Defense counsel

asserted the prosecutor lacked standing to challenge a prospective juror for cause on this basis. In response to further questioning by the court, L.R. iterated that he did not know whether he could base his decision solely on the evidence presented in court, and stated he did not know whether he would be a fair and impartial juror.

The trial court sustained the prosecutor's challenge, finding that "this juror cannot be fair and impartial. This juror is equivocating to the point where I have absolutely no idea what his state of mind is. He has indicated to me that he cannot base his decision in this case solely on the evidence produced in this courtroom, and that he has been so impressed and influenced by the pretrial publicity that he cannot be fair and impartial. I'm making that finding." Defense counsel again opposed the challenge "for the reasons . . . stated before," and also argued that "the attitudes expressed by [L.R.] . . . are not necessarily indicative of his state of mind, but more indicative of a desire not to serve. I don't think that creates a situation where the Court can legitimately make a finding that he cannot be a fair and impartial juror." The court stated, "I don't think he can be fair and impartial in this case. I have a duty to get fair and impartial jurors; he's not one of them."

### (2) *Excusal of Prospective Juror C.S.*

On her juror questionnaire, when asked whether defendant was guilty of the charges, Prospective Juror C.S. wrote "Yes—at least some of the charges—the murder charges, but I don't know if it's first degree." On voir dire, she repeatedly stated she did not know whether she could set aside her impressions and opinions about the case and base her decision upon the evidence presented in court. She stated her work in policy analysis did not involve "arbitrarily setting aside" information, and therefore she did not know whether she could set aside what she had heard out of court.

The prosecutor challenged C.S. for cause under *Bittaker, supra,* 48 Cal.3d 1046, because she could not make an affirmative declaration that she could set aside the views she derived from pretrial publicity. Defense counsel objected, contending that the prosecutor lacked standing, and that C.S. in fact could set aside what she might know about the case and her conclusions about the case. "My sense of listening to her and watching her is that the ambivalence that she has expressed doesn't have to do with her inability to go through the mental or intellectual exercise of setting things aside; it has to do more with the emotional level or the responsibility of making a decision involving someone else's life."

The trial court sustained the challenge. "With regard to this juror, the Court cannot get a clear indication of her state of mind based on her ambivalent and

ambiguous answers. I don't think that she can be fair and impartial. She said that she cannot set aside her opinions of the Defendant's guilt. When I asked her if she would make every effort to set aside those opinions, she said she didn't know, she didn't know whether she could do it. Under those circumstances, her opinion is that the Defendant is guilty, and she would have a very difficult time setting aside those opinions, and so the Court will grant the challenge based upon her inability to be fair and impartial in this case."

### (3) *Excusal of Prospective Juror D.M.*

On her juror questionnaire, Prospective Juror D.M. wrote in capital letters and underlined "Yes," when asked whether she thought defendant was guilty of the charges. In response to the question, "[H]ave you formed any opinions about this case," she wrote, "Right now, my vote is for the [d]eath sentence." On voir dire, she stated she understood the law required that she presume defendant innocent, but she had difficulty applying the presumption of innocence to defendant. She stated that she had heard about the case in media reports, and she would find defendant guilty beyond a reasonable doubt, based upon what she had heard in the press, without any evidence being presented. D.M. also noted she had changed her mind concerning the death penalty, and "would not be able to at any time be responsible for putting anybody to the death sentence." At the conclusion of the court's questioning, D.M. confirmed she would presume defendant guilty unless the contrary was proved.

The prosecutor challenged D.M. under *Bittaker*, noting: "She has an opinion about guilt. She has opinions about penalty . . . she's unfair to both sides . . . ." Defense counsel objected that the prosecutor did not have standing to make a challenge for cause under *Bittaker*. The trial court sustained the challenge, stating: "Counsel has the right to raise the issue of whether a juror can be fair and impartial, and this juror . . . exhibits the presumption of guilt as to the defendant. I don't see it any way that she is fair and impartial."

### (4) *Excusal of Prospective Juror D.R.*

On her juror questionnaire, in response to the question of whether defendant was guilty of the charges, Prospective Juror D.R. wrote, "Yeah—probably he did it—but why, what drove him to it, will he or could he be driven to it again?" She also stated she could not "handle knowing I was responsible for sending someone to the chair," or "responsibility for the death penalty." She disclosed that her fiancé was in prison for murder, and expressed the opinion that her fiancé would not be there if "he weren't poor, undereducated and Black." On voir dire, D.R. stated she did not know whether she would follow

the law as instructed by the court. She stated that her recollection of the details of the case was "hazy," but if something presented in court conflicted with something she recalled from media reports, she would question what had been presented in court. Defense counsel asked, "If the court were to tell you that it's your responsibility as a juror to decide this case solely on the evidence presented here in court would you follow that instruction?" D.R. answered, "No."

The prosecutor challenged D.R. under *Bittaker, supra,* 48 Cal.3d 1046. Defense counsel asserted that the prosecutor did not have standing to make this challenge, and also argued that D.R.'s "hazy" recollections "would not in any way impinge on her ability to listen to the evidence." The prosecutor "note[d] once again, that a fair trial is the providence of the court and everyone who knows what her opinions are like, they could impinge on the prosecution in terms of what magnificent little details she'd dredge up during the course of the trial."

The trial court sustained the challenge. "This juror has come in, expressed that attitude that defendant is guilty. . . . She has said that she . . . doesn't believe people tell the truth in court. She has said she cannot follow the court's instructions, follow the evidence in court. She said she would take whatever she remembers over what she sees in court. She has said she doesn't believe in the court system. She thinks that too many people make deals, and she trusts her perceptions far more than what is told to her. . . . It's abundantly clear to me that she is just totally unqualified to be a juror. I couldn't for the life of me understand why the defense persists in thinking that she above all the other people we've ever interviewed in this case, is going to be able to set aside whatever miniscule specific facts that she might have pertaining to this case and be a fair and impartial juror. She just flat out can't be. I think it would be a travesty of justice to let her remain on this case."

### b. *Analysis*

We held in *Bittaker, supra,* 48 Cal.3d at page 1090, that a prospective juror who "has an opinion based upon" media reports, "is qualified only if he affirmatively declares that he can and will act impartially. A declaration that he will try to be impartial, but doubts that he can succeed, is insufficient." (Italics omitted.)[10] Defendant describes the issue in the present case as "whether the *prosecutor* can make a *Bittaker* challenge to a juror on the

---

[10] Our decision in *Bittaker* interpreted former section 1076, which provided in relevant part: "No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to the jury, founded upon public rumor, or statements in public journals, circulars, or other literature, or common notoriety if upon his or her

ground that the juror has an opinion adverse to the *defendant*." The prosecutor's challenges and the trial court's rulings were not based, however, solely upon the ground that the prospective jurors held opinions adverse to defendant. Rather, the *Bittaker* challenges and the court's rulings were based upon these individuals' inability to set aside what they knew or believed concerning the case and to decide the issues based upon the evidence and pursuant to the court's instructions. Although particular opinions and beliefs expressed by these prospective jurors during voir dire revealed bias against defendant with respect to the issue of guilt, their answers also established they could not declare that they would decide the issues fairly and impartially based upon the evidence presented in court. Clearly, the prosecution's case could be harmed by jurors who would decide issues based upon rumors or information received outside of court, and who would not follow the court's instructions. Therefore, the premise of defendant's claim that the prosecutor lacked standing to challenge these prospective jurors—namely, that the prosecutor was not aggrieved by the prospective jurors' beliefs and attitudes—is mistaken.

Defendant's claim that the trial court erred in excusing the prospective jurors for cause also fails. "On review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*).) As noted above, L.R. and C.S. each repeatedly responded that they could not say whether they could set aside their impressions and opinions and decide the case based solely upon the evidence; D.M. stated she would decide based upon what she heard and saw in the press, unless the contrary was proven, and D.R. stated she would not follow an instruction that she decide the case solely upon the evidence presented in court. Thus, substantial evidence supports the trial court's

declaration, under oath or otherwise, it appears to the court that he or she can and will, notwithstanding that opinion, act impartially and fairly upon the matters to be submitted to him or her." (Quoted in *Bittaker, supra,* 48 Cal.3d at pp. 1088–1089.)

By the time of trial in the present case, section 1076 had been repealed, and juror challenges for cause were governed by Code of Civil Procedure sections 225 through 230. The bases for disqualifying a prospective juror for cause under these provisions are "[g]eneral disqualification," "[i]mplied bias," and "[a]ctual bias." (Code Civ. Proc., § 225, subd. (b)(1).) Among the grounds for general disqualification is "[t]he existence of any incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party." (*Id.,* § 228, subd. (b).) Among the grounds for finding implied bias is "[h]aving an unqualified opinion or belief as to the merits of the action founded upon knowledge of its material facts or of some of them." (*Id.,* § 229, subd. (e).)

findings that these jurors were not fair and impartial, and to the extent any of these jurors' responses were equivocal, the trial court's determination is binding.

█ Defendant contends the trial court's decision to excuse these jurors because they were biased against defendant interfered with defendant's right to have his counsel make tactical decisions, in violation of his right to counsel, and deprived him of a number of peremptory challenges equal to those allotted the prosecution. This claim is forfeited. In the trial court, defendant never conceded that these prospective jurors were biased with respect to the issue of guilt, or asserted that they nonetheless were desirable to defendant because of their stated views in other areas. Thus, *People v. Partida* (2005) 37 Cal.4th 428 [35 Cal.Rptr.3d 644, 122 P.3d 765], upon which defendant relies, is inapplicable. *Partida* held that constitutional arguments raised for the first time on appeal are not forfeited if they do not invoke reasons different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, to the extent erroneous *for the reasons actually presented to that court*, "had the additional legal consequence of violating" the Constitution. (37 Cal.4th at p. 435.) Here, the trial court never had the opportunity to consider whether defendant had the right to retain prospective jurors concededly biased with respect to the issue of guilt, but acceptable to the defense for other tactical reasons.

█ Moreover, as we have noted, these jurors properly were excused for reasons other than bias against defendant. Contrary to defendant's assertion, a trial court's proper grant of a prosecutor's challenge for cause neither confers upon the prosecution a greater number of peremptory challenges than the number to which it is entitled by statute, nor violates a defendant's right to counsel. Indeed, outside the context of challenges based upon juror views concerning the death penalty, a "[d]efendant has a right to jurors who are qualified and competent, not to any particular juror." (*People v. Holt* (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

### 4. *Defense challenges for cause*

Defendant contends the trial court erred in denying a defense challenge to Prospective Juror E.D. for cause, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[11] Following the court's refusal to excuse E.D., defendant used a peremptory challenge to excuse her.

---

[11] Defendant asserts the "court erred in denying defense challenges for cause," noting that the trial court denied 20 defense challenges, but he addresses only one denial of a defense challenge for cause, for the asserted reason that "the erroneous denial of even one challenge for cause was reversible error because it in effect deprived him of a peremptory challenge." Defendant states that, "[b]ecause the issue . . . is one of principle rather than numbers,

■ This claim is not preserved for appeal. Defendant exercised only 12 peremptory challenges, leaving him with eight remaining when he accepted the jury. (Code Civ. Proc., § 231, subd. (a).) " 'To preserve a claim of error in the denial of a challenge for cause, the defense must exhaust its peremptory challenges . . . .' " (*Hillhouse, supra,* 27 Cal.4th at p. 487.) Defendant contends his failure to exhaust available peremptory challenges was justified by his assertion in the trial court that, although he had eight challenges remaining, the venire included more than eight prospective jurors against whom he had made unsuccessful challenges for cause. We have rejected this contention above. (See *ante,* at p. 1085, fn. 8.)

Defendant asserts that this rule—that a defendant must exhaust all peremptory challenges before claiming on appeal that jurors should have been dismissed for cause—forces a defendant to choose between (1) accepting a biased jury or (2) exercising all peremptory challenges and risking a jury panel that is more unfavorable to the defendant than the panel presently seated. Without citation to authority, he "proposes a different, and more reasonable, method of determining whether a jury is unfair." Defendant's proposed method would require the court to consider (1) whether the jurors selected appear, from their backgrounds and answers in voir dire, to be "highly unfavorable" from the defense's viewpoint, (2) whether the "highly unfavorable" jurors are balanced by the presence of jurors favorable to the defense, and (3) whether the defense, but not the prosecution, was forced to employ peremptory challenges to remove jurors whom the court should have removed for cause. Defendant's test would require appellate courts to engage in a highly subjective evaluation of the relative "favorability" of jury panels. We decline to adopt defendant's proposed test.

We also reject defendant's contention that the assertedly erroneous denial of the challenge for cause to Prospective Juror E.D. is "reversible error because it in effect deprived him of a peremptory challenge." "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (*Ross v. Oklahoma* (1988) 487 U.S. 81, 88 [101 L.Ed.2d 80, 108 S.Ct. 2273]; see *id.* at pp. 89–91 [the court also rejected a challenge under the 14th Amend.]; *People v. Richardson* (2008) 43 Cal.4th 959, 987–988 [77 Cal.Rptr.3d 163, 183 P.3d 1146] ["where defendant did not exhaust all his peremptory challenges, he cannot even begin to demonstrate that his right to an impartial jury was impaired"]; *People v. Ashmus* (1991) 54 Cal.3d 932, 966 [2 Cal.Rptr.2d 112, 820 P.2d 214] ["That an allegedly biased juror might have sat had he or she not been removed by peremptory challenge does not implicate the right to a fair and impartial jury in any substantial way."],

[defendant] will discuss in detail only one of the jurors in question, [Prospective Juror E.D.]" We therefore limit our analysis to this prospective juror.

abrogated on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

### B. *Guilt phase issues*

#### 1. *Denial of suppression motions*

Defendant contends the trial court violated his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by erroneously denying several motions to suppress.

##### a. *Residence and vehicle search*

###### (1) *Factual background*

On February 16, at approximately 6:10 p.m., Sunnyvale Department of Public Safety Detectives Davis and Messier, joined by five San Jose Police Department officers, forced entry into defendant's residence to search for victims. Davis and at least one other officer looked in rooms, under beds, and in closets, but did not open any cabinets or drawers. Davis observed in plain view a rifle standing against a dresser, a gas mask on top of a different dresser, and gun-cleaning equipment on the coffee table. Due to earlier confusion concerning defendant's current address, Davis briefly looked at documents on a table to determine whether there was mail addressed to defendant. Approximately five to 15 minutes elapsed during the search, after which all but one San Jose officer left. Nothing was seized. Between approximately 6:30 and 6:45 p.m., Davis informed Sunnyvale Department of Public Safety Detective Piatanesi that no victims had been found.

At approximately 8:00 p.m., Piatanesi called Davis and instructed him and Messier to search the residence for explosives and garage door openers. They searched for these items for approximately 15 to 20 minutes, this time opening cabinets and drawers. No such items were found, and nothing was seized. At approximately 8:30 p.m., defendant was taken into custody at ESL.

The next day—February 17, 1988—law enforcement officers sought and obtained warrants to search defendant's residence and his vehicle parked in front of the house. The affidavit in support of the warrants represented that law enforcement authorities sought evidence regarding firearms; body armor; incendiary, explosive, or detonation devices; ammunition; photographs of defendant, Laura Black, or ESL; documents to or from Black or ESL; medical documents related to defendant; documents related to defendant's employment at ESL and Covalent; and evidence of ownership and occupancy of, and possessory right to, the vehicle and the residence. The affidavit stated

the following: utility records reflected that service at the residence was in defendant's name; defendant's former roommate identified defendant's vehicle in front of the house; defendant was a disgruntled former employee who had entered ESL and shot and killed seven individuals on February 16; an ESL employee identified defendant as the person who had entered the building with a shotgun; Laura Black stated defendant shot her at ESL on February 16, 1988, and had been harassing her for four years; on February 2, 1988, Black had obtained a TRO against defendant; an officer at the scene of the shooting had jumped inside the open motor home for cover and there observed a rifle with a scope, a large pile of empty ammunition boxes, and four gallons of inflammable liquid; Home Away From Home Rentals confirmed defendant had rented the motor home; and during the warrantless search of defendant's residence on February 16, a gas mask, a rifle, and gun-cleaning equipment were observed in plain view.

Defendant moved to suppress all evidence seized from his house and his vehicle. The trial court denied the motion.

### (2) *Analysis*

Defendant contends the two warrantless entries on February 16 were invalid, the search warrants were tainted by evidence obtained illegally in the warrantless searches, and the warrants lacked probable cause and sufficient particularity. We need not decide whether the warrantless searches were justified because (1) even assuming that the first warrantless search was invalid and excising from the search warrant affidavit the evidence observed during the first search, the affidavit nonetheless provided probable cause to support issuance of the warrants, and (2) the second warrantless search disclosed no additional evidence.

Probable cause to search exists when, based upon the totality of the circumstances described in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317]; *People v. Kraft* (2000) 23 Cal.4th 978, 1040–1041 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*); § 1525.) Excising from the search warrant affidavit the evidence observed during the first warrantless search (the gas mask, rifle, and gun-cleaning equipment), the affidavit alleged that defendant was a disgruntled former employee who on February 16 had entered ESL and shot and killed seven individuals, had harassed ESL employee Laura Black for four years and then shot her at ESL after the recent issuance of a TRO, and possessed a rifle with a scope, numerous empty boxes of ammunition, and inflammable liquid in the motor home he had rented and driven to ESL the day of the shooting. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1081 [86 Cal.Rptr.2d 337,

978 P.2d 1257].) These circumstances demonstrated a fair probability that evidence relevant to defendant's commission of the crimes existed in defendant's house and vehicle. (*Illinois v. Gates, supra,* 462 U.S. at p. 238; see *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1206 [275 Cal.Rptr. 729, 800 P.2d 1159] (*Gonzalez*) [the court acknowledged case law " 'recogniz[ing] that from the nature of the crimes and the items sought, a magistrate can reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items' "].)

 We also reject defendant's contention that the categories of the search warrants lacked sufficient particularity and allowed the searching officers "almost" unfettered discretion. "A search warrant must 'particularly describ[e] the place to be searched.' (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13; see also Pen. Code, § 1525.) 'The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.' (*Maryland v. Garrison* (1987) 480 U.S. 79, 84 [94 L.Ed.2d 72, 107 S.Ct. 1013].)" (*People v. Amador* (2000) 24 Cal.4th 387, 392 [100 Cal.Rptr.2d 617, 9 P.3d 993].) "Whether the description in a warrant of property to be seized is sufficiently definite is a question of law subject to independent review by the appellate court." (*Kraft, supra,* 23 Cal.4th at p. 1041.)

Here, the warrants sought evidence of defendant's possession and ownership of weapons and explosives, photographs and documents related to Black and ESL, documents concerning his employment at Covalent, proof of ownership and of a possessory right to the residence and the vehicle, and his medical and psychiatric records. Such description was sufficiently definite to allow the officer conducting the search to identify the property to be seized, and to prevent a wide-ranging exploratory search.

b. *Storage locker search*

On February 25, 1988, Detective Piatanesi obtained a search warrant for the storage locker rented in Mei Chang's name the weekend before the commission of the crimes.[12] The supporting affidavit sets forth the same information as was provided in support of the warrant to search defendant's

---

[12] The storage locker warrant identified the same evidence as that itemized in the warrants authorizing the search of defendant's residence and vehicle—defendant's firearms, ammunition, explosives, documents regarding and photographs of Black and ESL, employment at ESL and Covalent, and medical records—except the evidence respecting ownership and control of the storage locker apart from the residence and the vehicle.

residence and vehicle. In addition, the affidavit noted that Mei Chang had rented the storage locker on February 13, three days before the shootings, at defendant's request—because he had credit problems and needed the space to store computers, books, and tools. The affidavit further observed that Chang was with defendant when the locker was rented, but not when he moved property into it.

In the course of searching the storage locker, Piatanesi observed an IBM computer among the locker's contents. On March 18, 1988, he obtained a second warrant to search the locker, authorizing seizure of the computer observed during the first search of the locker, "including all software and hardware."

Defendant contends the first warrant to search the storage locker lacked probable cause and sufficient particularity, and because of these defects, the second warrant authorizing seizure of the computer was based upon tainted evidence. As to the first search warrant, in light of the circumstance that any items stored in the locker were placed there sometime during the three days preceding the shootings, a magistrate reasonably could conclude there was probable cause to believe incriminating evidence would be found in the storage locker. (See *Gonzalez, supra*, 51 Cal.3d at p. 1206.) Because the search authorized by the warrant was virtually identical to the search authorized with respect to defendant's residence and vehicle, the warrant was sufficiently particular in describing the objects of the search, for the same reasons as stated above. Moreover, defendant has not identified any item seized that was admitted at trial. Accordingly, even if we were to assume "some provision of the warrant was overbroad, defendant has not shown that any evidence should have been suppressed." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1043–1044 [90 Cal.Rptr.2d 607, 988 P.2d 531] (*Carpenter*).)

Because we conclude the first search of the storage locker was proper, we reject defendant's contention that the second search warrant was tainted by the first assertedly unconstitutional search of the storage locker. His additional contention—that documents from the telephone company, Pacific Bell, which were not identified in the warrant and were unrelated to the computer, improperly were seized in the second search—also fails. The documents from Pacific Bell were seized pursuant to a search warrant directed to Pacific Bell, and the return to that separate warrant apparently was attached inadvertently to the return to the second storage locker search warrant. Piatanesi testified that diskettes,[13] not documents from Pacific Bell, were seized in connection with the second search of the locker.

---

[13] The computer no longer was in the storage locker at the time of the second search.

c. *Seizure of personnel records*

On February 17, 1988, warrants were issued to search for documents and correspondence at ESL and Covalent relating to defendant, and to search his Covalent work area. The warrants were based upon the same affidavit that led to the issuance of warrants to search defendant's residence and vehicle. In addition to the information noted above, the affidavit stated that complaints regarding harassment are kept in personnel files, and based upon Detective Piatanesi's training and experience, individuals keep personal effects in their work areas. (See *ante*, at p. 1098.)

Defendant contends the affidavit in support of the warrants did not set forth facts adequate to establish probable cause to believe relevant evidence might be found at ESL and Covalent. We disagree. As noted, the facts enumerated in the affidavit indicated that on February 16 defendant killed seven individuals and shot Black at ESL because he was a disgruntled former employee and a rejected suitor of Black's, he was subject to a recent TRO to stay away from Black, and he had driven a motor home filled with gallons of inflammable liquid, ammunition, and a pistol to ESL on the day of the shooting. In view of the nature of the crimes and the items sought, a magistrate reasonably could conclude defendant's employment files and work area were logical places to search for incriminating items. (*Gonzalez, supra*, 51 Cal.3d at p. 1206.)

Defendant further contends the warrants lacked sufficient particularity, because they sought "[a]ny and all documents and correspondence relating to [defendant]." Again, we disagree. "[I]n a complex case resting upon the piecing together of 'many bits of evidence,' the warrant properly may be more generalized than would be the case in a more simplified case resting upon more direct evidence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1291 [65 Cal.Rptr.2d 145, 939 P.2d 259].) In any event, defendant has not identified any item seized pursuant to these warrants that was admitted at trial. "Accordingly, even if we [were to] assume [these warrants were] overbroad, defendant has not shown that any evidence should have been suppressed." (*Carpenter, supra*, 21 Cal.4th at pp. 1043–1044.) Defendant speculates that evidence found during the search, even if not admitted at trial, may have been used to obtain evidence to counter the defense case in mitigation, but he fails to demonstrate any factual basis for this claim.

d. *School and medical records search*

Defendant contends warrants to obtain his school and medical records from the high school and several colleges he attended were overbroad. As he notes, however, no medical records were produced in response to the warrants, and the school transcripts that were produced were not introduced by the prosecution at trial. Hence there was no evidence admitted that should have been

suppressed. (*Carpenter, supra*, 21 Cal.4th at pp. 1043–1044.) Defendant speculates that evidence found during the search, even if not admitted at trial, may have been used to obtain evidence to counter the defense case in mitigation, but he fails to demonstrate any factual basis for this claim.

### 2. *Evidentiary rulings*

Defendant claims that certain evidentiary rulings were erroneous and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### a. *Letters to Laura Black*

Defendant wrote Black approximately 150 to 200 letters. During the prosecution's direct examination of Black, 20 of these letters were admitted into evidence. The letters included the threatening comments noted above, and also showed defendant importuning Black to socialize with him, his obsessive need to know her whereabouts, his desire to buy a house with her, and information regarding his relationship with Mei Chang, his college classes, his work at Covalent and another company, his roommate, the foreclosure on his house, and his obligation to pay $30,000 to the IRS. The letters also included statements such as that defendant cared for Black and "tried never to really threaten you," "I wouldn't hurt you and I think you realized that," and "Jean," presumably Jean Tuffley, "should have sent us both to a marriage counselor to find out why we fight like an[] old married couple."

During defendant's cross-examination of Black, he sought to question her concerning 13 other letters he wrote to her. He asserted those letters were admissible under Evidence Code section 356,[14] because they were necessary to understand other documents admitted into evidence. The trial court admitted two of the 13 letters and excluded the remaining 11 letters as hearsay, stating that, although the latter letters pertained to the same general subjects as the letters proffered by the prosecution, they were "separate and distinct statements" from the letters proffered by the prosecution.

During defendant's testimony on direct examination, he again sought admission of the 11 letters, arguing they were necessary to understand defendant's state of mind and corroborated his testimony regarding his state

---

[14] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

of mind. He also argued they were admissible under Evidence Code section 356 to show the evolution and context of the letters. The trial court sustained the prosecutor's objection, ruling the letters were hearsay.

Near the conclusion of defendant's testimony on direct examination, defendant sought to introduce six additional letters. The court admitted two of these letters. The two letters, and the two previously proffered by defendant and admitted by the court, noted that over the prior period of nearly three years, defendant had "never hurt you or your property," referred to Black as the "love of my life," profusely apologized for past behavior, and asked Black to buy a house with him, enumerating 16 discussion points (such as what would happen if one person missed a monthly payment) for working "out an agreement that both of us can live by."

Defendant contends that all of the letters were admissible under Evidence Code section 356 during his testimony, because the letters presented "the true tenor of the correspondence" by showing "not only [defendant's] obsessive need for Black, but also his attempts to understand her, his concern with how she was feeling, and his attempts to control his behavior." He asserts, "[I]f it is unreasonable to introduce . . . all 150 letters—then at least a *representative* portion should be shown to the jury."

The trial court did not abuse its discretion in concluding that the proffered letters were not "necessary" to the jury's understanding of the letters introduced by the prosecution. (Evid. Code, § 356.) Rather, the letters proffered by the prosecution were "independently comprehensible" on the relevant topics of defendant's premeditation and intent to kill. (*People v. Barrick* (1982) 33 Cal.3d 115, 131, fn. 4 [187 Cal.Rptr. 716, 654 P.2d 1243] [postarrest statement not necessary to understand prearrest statement].)[15] Therefore Evidence Code section 356 did not provide a basis for the admission of these letters.

Defendant also contends the letters were admissible to establish his state of mind. (See *People v. Green* (1980) 27 Cal.3d 1, 23, fn. 9 [164

---

[15] The cases upon which defendant relies are distinguishable. In *Hinton v. Welch* (1918) 179 Cal. 463, 466 [177 P. 282], numerous letters written by the plaintiff were introduced *against* her. In contrast, defendant here sought to introduce his own out-of-court statements during his direct testimony. (See Evid. Code, § 1220.) Likewise, admission of the *reply* to one of the plaintiff's letters asserting a property interest falls within the language of Evidence Code section 356. (*Hinton*, at pp. 465–466.) In *People v. Snyder* (1958) 50 Cal.2d 190, 192 [324 P.2d 1], we held that in defending a charge that the defendant had committed perjury in his testimony before the grand jury, the defendant was permitted to introduce portions of the grand jury testimony that tended to explain the testimony upon which the prosecutor relied in proving the perjury charge, and to demonstrate that the defendant had not testified falsely. (*Id.* at pp. 193–195.) Hence *Snyder* is not authority for the admission of letters *different* from those upon which the prosecution relied.

Cal.Rptr. 1, 609 P.2d 468], disapproved on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512], and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99] [victim's out-of-court statement was not hearsay when offered as circumstantial evidence of the victim's state of mind rather than to prove the truth of the statement]; Evid. Code, § 1250, subd. (a)(1) [evidence of a statement of the declarant's then existing state of mind is not made inadmissible by the hearsay rule when offered to prove the declarant's state of mind].) Defendant testified, describing his various states of mind not only during the years he pursued Black and sent her numerous letters, but also when he received the TRO, as he thereafter prepared to confront Black, and as he undertook his assault upon the ESL facility. Moreover, the letters that were admitted established the facts he claims would have been adduced by the excluded letters, that is, defendant's purported love and concern for Black, his obsessive need for and delusion regarding her, and his attempts to control his behavior. Therefore, to the extent the letters he proffered establish the depth of his delusion, and thereby suggest "the destruction of the psychic reality [he] had constructed and maintained in his mind for four years" and explain his state of mind during his rampage, their exclusion was harmless. It is not reasonably probable a result more favorable to defendant would have been reached had the letters been admitted to establish his state of mind. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Although defendant makes no persuasive argument supporting his contention that the exclusion of the letters constitutes a violation of his right to present a defense, we observe that, in light of the extensive evidence presented relating to defendant's state of mind, exclusion of the proffered letters also was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)[16]

b. *Impeachment of Gerald Hirst*

As noted above, Gerald Hirst testified that when he, Lawrence Kane, and defendant met approximately two months prior to defendant's commission of the crimes, they discussed how to get through ESL's security doors and fantasized about shooting ESL's equipment. During their conversation, defendant learned where Black's and Hirst's offices were located. (See *ante*, at p. 1063.)

The trial court ruled in limine that defendant would not be allowed to impeach Hirst with evidence establishing that in 1986, Hirst had suffered a

---

[16] Defendant further asserts the letters would have personalized him at the penalty phase. This purpose was irrelevant at the guilt phase, and defendant did not seek admission of the letters at the penalty phase.

misdemeanor conviction for child molestation, or with the conduct underlying that conviction. The court did not state the basis for its ruling.

Even assuming the trial court erred in precluding impeachment of Hirst with evidence of his act of child molestation, defendant fails to demonstrate, as he must, that the "cross-examination would have produced 'a significantly different impression of [the witness's] credibility.' " (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*), disapproved on other grounds in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) The accuracy and veracity of Hirst's testimony was undermined by other evidence: he was completely deaf in one ear; he was depressed and in therapy at the time of the conversation with defendant; he refused to allow the police to record interviews with him; and his earlier statements to the police that his conversation with defendant occurred at the time Hirst left ESL in January 1988, and that he knew Black, were inconsistent with his trial testimony that the conversation occurred in December 1987, and that he did not know Black.

Moreover, and contrary to defendant's contention, Hirst's testimony was not "the single most important evidence of premeditation offered by the prosecution." Rather, aside from this testimony, there was overwhelming evidence of premeditation with respect to all of the killings, including the murder of Lawrence Kane. During the two years preceding commission of the crimes, defendant told several individuals at ESL that he possessed guns and either knew how or was not afraid to use them. Although he discussed shooting ESL *equipment* with Hirst, during that same time period he mentioned the shooting massacre at the San Ysidro McDonald's to a different witness, Burch, and wondered what ESL would do if he committed such a massacre there. Days before the shooting spree, defendant sold his truck for much less than it was worth, rented a storage locker, purchased a new Benelli shotgun by tendering a bad check, purchased large amounts of ammunition, practiced shooting "man-shaped" targets, rented a motor home that allowed him to prepare for his assault without observation, and changed his life insurance beneficiary. His will was left on top of his computer terminal. Finally, on February 16, 1988, defendant entered ESL during work hours, heavily armed.

c. *Evidence of defendant's interest in flame guns*

During the direct testimony of Mei Chang, defense counsel sought to preclude reference to an incident that occurred the weekend preceding commission of the crimes, when defendant expressed interest in a flame gun. The court overruled the objection, finding the evidence relevant and not unduly prejudicial under Evidence Code section 352.

Chang testified that on the night of Valentine's Day, she and defendant watched the movie Rambo (Anabasis N.V. 1982). The prosecutor inquired whether defendant told Chang "to pay any special attention to some parts of the movie?" Chang identified "[t]he firing," and explained, "in the movie lots of fire guns, fires." The prosecutor asked, "Did he say anything about any particular kind of gun?" Chang responded, "I think that's the one he was using, the one with a lot of fire out. A fire gun."

We reject defendant's contention that the evidence was irrelevant and inflammatory. The evidence was relevant because it demonstrated defendant's continuing interest in firearms during a period immediately preceding defendant's charged criminal conduct. When contrasted with defendant's murderous assault two days later, the evidence cannot be characterized as unduly inflammatory. The trial court did not abuse its discretion in admitting this evidence. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118 [74 Cal.Rptr.2d 121, 954 P.2d 384] (*Barnett*) [applying abuse of discretion standard of review].) Nor did its admission violate defendant's right to a fundamentally fair trial.

### d. *Conversation between Dennis Elliott and defendant*

As noted above, Dennis Elliott, who previously had supervised defendant at ESL, described at trial a conversation he had with defendant in March or April 1986. Elliott had reported to defendant what Elliott had heard concerning defendant's conduct toward "some girl," and had urged defendant to stop harassing her at work. Defendant had responded by expressing anger and defiance.

Prior to Elliott's testimony regarding his conversation with defendant, defendant objected that neither what Elliott had heard from other persons, nor his conversation with defendant years before the charged crimes, was relevant to defendant's state of mind on February 16, 1988, and that the testimony was unduly prejudicial under Evidence Code section 352. The trial court overruled this objection, stating that testimony concerning what Elliott had heard about defendant "chasing some girl" was being offered solely to explain why Elliott spoke to defendant. Although the record is somewhat ambiguous, it appears the court also ruled that the testimony of the conversation between defendant and Elliott was relevant and not unduly prejudicial or time consuming under section 352.

Defendant contends that what Elliott heard from others about defendant "chasing some girl" was hearsay. He also contends that Elliott's conversation with defendant was irrelevant because it occurred two years before the murders and did not imply "any threat to kill anyone or to damage ESL

property." Defendant did not make a hearsay objection below, nor did he argue that the conversation was irrelevant because it did not threaten violence or damage. Therefore, these claims are forfeited and, moreover, are without merit, as are his remaining relevance claims. As the trial court observed, testimony regarding what Elliott heard was not hearsay because it was not offered for its truth. It was relevant to explain why Elliott had a conversation with defendant. Defendant's defiant response to Elliott's advice that he just do his job and avoid "hassling" a female coworker was relevant to defendant's state of mind, and to the prosecutor's theory that defendant acted on February 16 in retaliation for perceived wrongs by ESL and Laura Black. In addition, the prosecution properly was permitted to demonstrate the circumstances that led over time to defendant's termination, and ultimately to his attack on ESL.

### e. *Jean Tuffley's testimony*

Before trial, and again shortly before Tuffley testified, defendant moved to exclude evidence of the February 1986 conversation between Tuffley and defendant in which, according to Tuffley, defendant said, "if we terminated him, that his life would be over, he'd have nothing to live for, and that he had guns and he wasn't afraid to use them, and that if we terminated him, it would be over for him and he'd take people with him." Tuffley asked, "Rich, are you saying that you would kill me?" According to Tuffley, defendant said, " 'Yes, but I would take others, too.' " Defendant asserted that the conversation was so remote in time that it was irrelevant and immaterial, that it was improper character evidence under Evidence Code section 1101, and that under Evidence Code section 352 its minimal probative value was outweighed by its prejudicial impact. Defendant also objected to Tuffley's testimony that defendant's comments put her in fear, and led to ESL's assigning a different human resources person to deal with defendant, on the ground Tuffley's state of mind was irrelevant. The trial court denied the defense motions and overruled the objection.

Defendant claims that his mental state at the time of this conversation with Tuffley was irrelevant because he "did not kill or attempt to kill Tuffley," and "did not kill anyone when he was terminated." Although defendant did not kill Tuffley, who was not present at M-5 on the afternoon of February 16, 1988, his threats to her anticipate the scenario ultimately played out in the crimes that later were committed. Hence the statements were powerful evidence of long-standing motive and intent. They demonstrated that defendant's 1988 assault on ESL was not a spontaneous occurrence, but a planned attack and the culmination of a grudge he nursed for at least two years.

Defendant also claims Tuffley's testimony that defendant's comment made her fearful and led to ESL's transferring responsibility over defendant from

Tuffley to her superior, Allen, should have been excluded because Tuffley's state of mind was not at issue "and the balance of the testimony is hearsay." We disagree. Tuffley's fear demonstrated she perceived the threat as serious. Likewise, the circumstance that the personnel matter was transferred to someone else dispelled any inference that Tuffley did nothing about the problem and thus apparently did not believe defendant's threat was genuine. Finally, contrary to defendant's contention, testimony that someone else assumed responsibility for defendant's personnel matters was not an out-of-court statement and hence was not hearsay. We conclude the trial court did not abuse its discretion in admitting Tuffley's testimony. (See *Barnett, supra,* 17 Cal.4th at p. 1118.) We therefore reject defendant's contention that its admission violated his rights to due process and a reliable verdict.

### f. *Evor Vattuone's testimony*

Before Evor Vattuone testified, defendant sought to exclude reference to Vattuone's conversation with defendant in late February or March 1986, in which defendant told Vattuone that if defendant were to be served with a restraining order, he would be very upset and did not know how he would respond, and that "he had guns and he wasn't afraid to use them." Defendant contended the conversation was irrelevant because it occurred almost two years before defendant was served with the TRO, constituted improper character evidence under Evidence Code section 1101, and was unduly prejudicial under Evidence Code section 352. The trial court found the evidence was relevant and was not character evidence, and that its probative value outweighed any prejudicial effect.

Defendant contends this testimony should have been excluded because in his conversation with Vattuone defendant did not threaten to kill anyone; rather he said he did not know how he would respond. Defendant also contends his state of mind in 1986, and particularly his uncertainty concerning how he would respond to a restraining order, was irrelevant. Defendant did not, however, state only that he did not know how he would react; he said he had guns and was not afraid to use them. This statement reasonably may be construed as a threat. Moreover, according to Vattuone, when defendant said he did not know what he would do, he did not seem perplexed, but serious and deliberate. Defendant's statements to both Tuffley and Vattuone indicate he planned to shoot individuals at ESL if his access to Black was limited. Far from irrelevant, his statements constituted evidence establishing that he already was contemplating his eventual assault two years prior to the ultimate event. We find no abuse of discretion and no infringement upon defendant's right to due process and a reliable verdict.

### g. Lieutenant Dow's testimony that Black felt threatened

Sunnyvale Department of Public Safety Lieutenant Chris Dow, called by the defense, testified that he interviewed Black twice in March 1988 following the shootings. Black told Dow that she decided not to seek a restraining order after she was told ESL would not pay for it. On June 1, 1988, after reviewing a copy of Dow's report, Black amended this statement to say that an additional reason she did not obtain a restraining order was that she did not have the time to do so. Defense counsel asked Dow, "Did she tell you . . . on June 1st . . . that the reason she didn't get a restraining order was because she was afraid of [defendant]?" Dow answered, "No." Defense counsel asked, "Did she tell you on June 1st . . . that the reason[] she didn't get the restraining order was because she was concerned with what [defendant] might do?" Dow answered, "No."

On cross-examination, the prosecutor inquired whether Black told Dow, during "either of the taped conversations" about the restraining order, "that she also didn't get a restraining order because she figured it wasn't against the law for the Defendant to be on a public street?" Dow responded, "Yes." The prosecutor asked, "Did you ever ask her specifically whether she didn't get a TRO or restraining order because she was afraid of the Defendant?" Dow responded, "No." The prosecutor then asked, "Did Miss Black, in the course of those conversations, tell you that the Defendant had threatened her?" Defendant objected that the question was beyond the scope of the direct examination, which, he claimed, was limited to Dow's conversation with Black on June 1. The objection was overruled, and Dow answered, "Yes."

Defendant contends his objection should have been sustained under Evidence Code section 773, because the direct examination was "limited to the concerns that influenced Black's initial decision not to get a restraining order. They did not open up the content of all of her conversations with Dow." "Cross-examination . . . 'may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given . . . on direct examination.' [Citation.] The cross-examination is not 'confined to a mere categorical review of the matters, dates or times mentioned in the direct examination.' " (*People v. McClellan* (1969) 71 Cal.2d 793, 811 [80 Cal.Rptr. 31, 457 P.2d 871].) Defendant's questioning of Dow may have left the jury with the impression that Black was not frightened by defendant. The prosecutor properly was allowed to question Dow concerning other statements made by Black that tended to establish she was frightened by defendant. (See *People v. Farnam* (2002) 28 Cal.4th 107, 187–188 [121 Cal.Rptr.2d 106, 47 P.3d 988] [the prosecutor was entitled to ask the defendant questions on cross-examination to rebut impressions left by the defendant's testimony].) Thus, the trial court did not abuse its discretion in allowing cross-examination

of Dow concerning Black's statements to Dow regarding threats made by defendant against Black. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 102 [58 Cal.Rptr.3d 608, 158 P.3d 157] [" 'It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination.' "].)

### h. *Alleged pattern of inconsistent determinations*

Defendant contends the trial court's evidentiary rulings reveal a pattern of inconsistent determinations that compromised the fairness of the trial and unfairly favored the prosecution. This essentially is a claim of judicial bias, which defendant forfeited by failing to assert it below. (*People v. Samuels* (2005) 36 Cal.4th 96, 114 [30 Cal.Rptr.3d 105, 113 P.3d 1125]; see *People v. Chatman* (2006) 38 Cal.4th 344, 362–363 [42 Cal.Rptr.3d 621, 133 P.3d 534].) It also is without merit. We have rejected all of defendant's claims of evidentiary error except for assumed error in the exclusion of evidence of Hirst's prior misdemeanor conviction, and in the exclusion of defendant's letters as evidence of his state of mind. Although defendant summarily cites many additional examples in his supplemental opening brief which, he claims, illustrate that the trial court made erroneous and inconsistent rulings, he provides no analysis to establish that the trial court abused its discretion in connection with any of these rulings. "[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Defendant fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was so prejudicial that it deprived defendant of " ' "a fair, as opposed to a perfect, trial." ' " (*Ibid.*)

### i. *Cumulative error*

Defendant contends the trial court's errors on the evidentiary rulings were individually and cumulatively prejudicial because they deprived him "of his right to present probative evidence or exclude prejudicial evidence," and constituted "an invidious and pervasive pattern of biased rulings." As noted, we have assumed error only in the exclusion of evidence related to Hirst's prior misdemeanor conviction, and in the exclusion of defendant's letters as evidence of his state of mind. Hirst was impeached through other testimony, and the issues to which Hirst's testimony and the excluded letters were relevant were established by other overwhelming evidence. Defendant was not prejudiced under any standard by these two evidentiary rulings. Nor, once again, has any bias been demonstrated.

### 3. *Alleged instructional error*

#### a. *Felony-murder and felony-murder special-circumstance instructions based upon burglary allegations*

The prosecution proceeded on two theories of first degree murder: (1) all of the homicides were willful, deliberate, and premeditated, and (2) the homicides perpetrated within the M-5 building were committed in the course of a burglary. (§ 189.)[17] The trial court instructed the jury on two theories of burglary: "Every person who enters any building with a specific intent to commit assault with a firearm upon the person of Laura Black in violation of Penal Code Section 245(a)(2) *or* with the specific intent to commit malicious damage of property of a value in excess of five thousand dollars in violation of [former] Penal Code Section 594(b)(1), each a felony, is guilty of the crime of burglary in violation of Penal Code section 459." (Italics added; see also § 459 [any person who enters a defined structure with the intent to commit any felony is guilty of burglary].) The court also gave an instruction based upon the felony-murder rule: "The unlawful killing of a human being . . . which occurs during the commission or attempted commission . . . of the crime of burglary is murder of the first degree when the perpetrator had the specific intent to commit such crime." The court further explained that "[a] homicide is committed in the perpetration of a burglary if the killing and the burglary are parts of one continuous transaction," but "[t]here is no requirement that the homicide occur while committing or while engaged in the burglary or that the killing be a part of the burglary other than that the two acts be part of one continuous transaction." Finally, the court instructed the jurors that they could find true the special circumstance allegation that defendant committed a murder while engaged in the commission or attempted commission of a burglary if defendant committed a murder while committing or attempting to commit a burglary, and did so to carry out or advance the

---

[17] Section 189 provides in relevant part: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree."

Although section 189 refers to "[a]ll murder" that is "committed in the perpetration of, or attempt to perpetrate" certain felonies, this language has long been broadly interpreted to mean "any killing in the perpetration of or attempt to perpetrate" an enumerated crime. (*People v. Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570]; see *People v. Denman* (1918) 179 Cal. 497, 498–499 [177 P. 461] ["one who kills another in the perpetration or attempt to perpetrate" the crimes enumerated in § 189 is guilty of first degree murder under the provisions of that statute, "regardless of any question whether the killing was intentional or unintentional"].)

commission of the burglary or to facilitate his escape or avoid detection. The court's instructions made clear that the special circumstance allegation was not established if the burglary or attempted burglary was merely incidental to the commission of the murder.[18]

Defendant claims that neither burglary theory supports a finding that the homicides committed within building M-5 constituted felony murder. First, defendant asserts, the charge of burglary with the intent to commit property damage in excess of $5,000 could be either a felony or a misdemeanor under former section 594, subdivision (b)(1), depending upon the sentence imposed by the court. Therefore, defendant contends, he could not have entered ESL's facility with the intent to commit *a felony*, and thus could not be found guilty of burglary. Second, defendant asserts, the burglary premised upon entry with intent to assault *Black* would have "merged" with the death of *Black*, had she been killed, and would not have constituted a felony—independent of the killing itself—upon which to base a theory of felony murder. (*People v. Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22] (*Wilson*).) Therefore, he contends, his entry with the intent to assault Black cannot serve as the basis for the felony murder of six *other* victims who were killed inside the ESL facility, nor can it support a special circumstance finding that the murders occurred while defendant was engaged in committing a burglary. Defendant claims the giving of the foregoing instructions violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

 Defendant's first challenge to the felony-murder instruction is that a violation of former section 594, subdivision (b)(1) "is not a felony but a wobbler, whose ultimate classification will depend on the judge's sentence."[19] Consequently, he contends, a burglary count based upon an entry with intent to violate former section 594, subdivision (b)(1) is not a felony burglary. A felony, however, is defined as "a crime which is *punishable* with death or by imprisonment in the state prison." (§ 17, subd. (a), italics added.) Former section 594, subdivision (b)(1) provided that "[i]f the amount of defacement, damage or destruction is five thousand dollars ($5,000) or more, vandalism is punishable by imprisonment in the state prison . . . ." That a judge ultimately

---

[18] As to Lawrence Kane, who was killed before defendant entered the building, the prosecution proceeded solely on a theory of willful, deliberate, and premeditated murder.

[19] At the time of defendant's crimes, section 594 provided in relevant part:

"(a) Every person who maliciously (1) defaces with paint or any other liquid, (2) damages or (3) destroys any real or personal property not his own, in cases otherwise than those specified by state law, is guilty of vandalism.

"(b)(1) If the amount of defacement, damage or destruction is five thousand dollars ($5,000) or more, vandalism is punishable by imprisonment in the state prison, or in a county jail not exceeding one year, or by a fine of not more than ten thousand dollars ($10,000), or by both that fine and imprisonment." (Stats. 1985, ch. 781, § 1, p. 2520.)

may impose a sentence other than state prison, making the crime a misdemeanor, does not remove former section 594, subdivision (b)(1) from the class of crimes that may form the basis for a burglary conviction. (See § 17, subd. (b)(1); see also *People v. Rathert* (2000) 24 Cal.4th 200, 202, 208 [99 Cal.Rptr.2d 779, 6 P.3d 700] [the defendant was convicted of burglary predicated upon felony false personation, which crime is a "wobbler"].) The instructions required the jury, in order to find defendant guilty of burglary, to find that he entered with the intent to cause property damage in excess of $5,000. Such conduct is punishable by imprisonment in state prison. That is sufficient to establish the commission of a felony supporting the giving of the burglary instruction.[20]

Defendant's second challenge to the felony-murder instruction is that the entry with the intent to assault Black merged with the six homicides committed inside ESL's facility. His theory finds its roots in *People v. Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*), in which the defendant was found guilty of the second degree murder of his wife, whom he fatally assaulted with a firearm. We concluded that the jury instructions may have been understood to direct the jury to "find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon" (*ibid.*), and we held that it was error to instruct the jury concerning felony murder in these circumstances. Our opinion in *Ireland* explained that use of the felony-murder rule in cases in which the defendant is charged with assaulting and killing the victim "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (*Ibid.*)

In *Wilson, supra*, 1 Cal.3d 431, we extended *Ireland*'s merger doctrine to *first degree* felony murder based upon a burglary committed with the intent to assault the murder victim. The first degree felony-murder rule is set forth in section 189: "All murder which is . . . committed in the perpetration of, or attempt to perpetrate, [certain enumerated felonies, including] burglary, . . . is murder of the first degree." In *Wilson*, the instructions authorized the jury to find the defendant guilty of first degree murder if "he entered [his wife's] bathroom with an intent to commit an assault with a deadly weapon and thereby committed a burglary, in the course of which he killed his wife."

---

[20] We also reject defendant's further contention that the court's instructions concerning vandalism as a predicate crime for burglary were erroneous because "the relevant criminal intent under section 594" is not intent to cause property damage of at least $5,000, but only to deface, damage, or destroy property. If, by requiring the jury to find an intent to cause property damage in excess of $5,000, the instruction required more than the statute, this inured to defendant's benefit.

(1 Cal.3d at p. 439.) We observed that "the only basis for finding a felonious entry is the intent to commit an assault with a deadly weapon," and concluded that, "[w]hen, as here, the entry would be nonfelonious but for the intent to commit the assault, and the assault is an integral part of the homicide and is included in fact in the offense charged, utilization of the felony-murder rule extends that doctrine 'beyond any rational function that it is designed to serve.' " (*Id.* at p. 440.) Therefore, we held that "an instruction on first degree felony murder is improper when the underlying felony is burglary based upon an intention *to assault the victim of the homicide* with a deadly weapon." (*Id.* at p. 442, italics added.)

Defendant proposes that the merger rule established in *Wilson* be extended further to prohibit application of the felony-murder rule when the burglary charge is based upon an intention to assault someone other than the victim of the homicide. Defendant relies upon *People v. Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847] (*Sears*), in which the defendant entered his estranged wife's home and assaulted her and her daughter, killing the daughter. The jury instructions, together with the trial court's answer to a question from the jury, "could reasonably be understood to mean that if defendant entered with intent *to assault his wife and stepdaughter* he was guilty of burglary and that the first degree felony-murder rule was applicable." (*Id.* at p. 188 (lead opn. of Peters, J.), italics added.) Therefore, under the principles enunciated in *Ireland, supra,* 70 Cal.2d 522, and *Wilson, supra,* 1 Cal.3d 431, Justice Peters's lead opinion, in which Chief Justice Traynor and Justice Tobriner concurred, held that the merger doctrine precluded reliance upon the felony-murder rule to find the defendant guilty of first degree murder. In his concurring opinion, in which Justices Burke and Sims (assigned) concurred, Justice Sullivan stated that he "agree[d] generally . . . that the court's instructions on the first degree felony-murder rule in this case were erroneous . . . . However, I do not agree with, and do not join in, the additional views of the [lead opinion], relating to the felony-murder rule." (*Sears,* at p. 191 (conc. opn. of Sullivan, J.).)[21]

Defendant relies upon the "additional views" of the lead opinion, to which Justice Sullivan's concurring opinion referred. (*Sears, supra,* 2 Cal.3d at p. 191 (conc. opn. of Sullivan, J.).) Those additional views related to the Attorney General's theory that the evidence also supported the conclusion that the defendant entered with the intent to assault his wife but not his stepdaughter, and "that the felony-murder rule is applicable on the theory that the burglary based on the intent to assault the wife was independent of and collateral to the killing of the stepdaughter." (*Id.* at p. 188 (lead opn. of Peters, J.).) The lead opinion responded that "the instructions given to the jury did not posit the applicability of the felony-murder rule upon any such

---

[21] Justice McComb summarily dissented. (*Sears, supra,* 2 Cal.3d at p. 191.)

theory." (*Id.* at p. 189.) Nonetheless, the lead opinion expressed the view that "[i]t would be anomalous to place the person who intends to attack one person and in the course of the assault kills another inadvertently or in the heat of battle in a worse position than the person who from the outset intended to attack both persons and killed one or both." (*Ibid.*)

As our summary reflects, a majority of the justices in *Sears* agreed only that the actual instruction and the court's answer to a jury inquiry—which reasonably could be understood to signify that "if defendant entered *with intent to assault his wife and stepdaughter* he was guilty of burglary and . . . the first degree felony-murder rule was applicable" (*Sears, supra,* 2 Cal.3d at p. 188 (lead opn. of Peters, J.), italics added)—were inconsistent with the merger doctrine (*ibid.*). Furthermore, the additional views expressed in response to the Attorney General's theory are dicta in the lead opinion itself. Thus, the lead opinion and the concurring opinion in *Sears* establish only that if the jury in the present case had been instructed that defendant entered ESL's facility with the intent to assault all of his homicide victims, the merger doctrine would have precluded reliance upon the felony-murder rule to find defendant guilty of first degree murder.

█ Following our opinion in *Sears, supra,* 2 Cal.3d 180, we have assumed that the felony-murder rule applies to a burglary in which there was an intent to assault an individual other than the homicide victim. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083 [124 Cal.Rptr.2d 373, 52 P.3d 572] (*Gutierrez*).) In *Gutierrez*, the defendant forced his way into his estranged wife's home, and while his accomplice held a gun to the wife in the living room, the defendant forced his way into the bathroom and killed his wife's boyfriend. The jury was instructed on first degree felony murder based upon burglary committed by the defendant with the intent to commit five target felonies, including assault with a deadly weapon upon his wife. We upheld the defendant's first degree murder conviction, observing: "Notably, [the killing of the boyfriend] was not alleged as a target offense of the burglary . . . . Had the independent target offenses not been alleged in connection with the burglary charge, the merger doctrine might have applied. (See *People v. Wilson*[, *supra,*] 1 Cal.3d [at pp.] 439–442 . . . .)" (*Gutierrez, supra,* 28 Cal.4th at p. 1140, fn. 7.) Similarly, in the present case, the assaults upon victims other than Black were not alleged as target offenses of the burglary. Rather, only the target offenses of intent to assault Black and to vandalize were alleged in connection with the burglary charge. Therefore, the target

offenses alleged by the prosecutor did not merge with the killings of the six individuals inside the M-5 building, and there was no error in the instruction on felony murder.[22]

Although our jurisprudence, including the decision in *Wilson, supra,* 1 Cal.3d 431, supports the conclusion that defendant's entry with intent to assault Black did not merge with the six homicides committed within the ESL facility, we acknowledge that our past decisions applying the merger doctrine to first degree felony murder premised upon burglary have resulted in questionable distinctions. As illustrated by *Sears, supra,* 2 Cal.3d 180, whether a defendant may be convicted of felony murder may depend upon whether the prosecutor chooses to allege and prove that the defendant entered

---

[22] Although we conclude that both theories of felony murder were valid, we note that the record reflects the jury also must have concluded the homicides were willful, deliberate, and premeditated. The prosecution argued that if the jury found that when defendant "went to ESL that day [he] had it in mind that he would kill anyone who even marginally became an obstacle during his mission[,] . . . [t]hat would be willful, deliberate and premeditated murder as to those persons he killed while he was on his mission." The prosecution made essentially the same argument in connection with the attempted murder counts—if defendant "went into that building intending to shoot everybody he could see, intending to kill everybody he could see, then that would be willful, deliberate and premeditated attempted murder on each of those persons that he went after." The jury specifically found that all five counts of attempted murder were willful, deliberate, and premeditated. Other than Black, for whom attempted murder was not charged, defendant knew none of the individuals he shot, and nothing in the record indicates that the circumstances of any of the murders were different from the circumstances of the attempted murders in any way that could affect whether the murders were willful, deliberate, and premeditated. Indeed, the murder of Ronald Doney and the attempted murder of Richard Townsley occurred at the same time. The jury also specifically found that the murder of Lawrence Kane, who was shot outside ESL, was willful, premeditated, and deliberate. Thus, there is no logical basis upon which to conclude that the jury could have found that the murder of Kane and the attempted murders of five other individuals were willful, deliberate, and premeditated, but that the other homicides were not. Therefore, even if the jury had been improperly instructed regarding felony murder, "other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for" premeditated murder, and hence any error was harmless beyond a reasonable doubt. (*People v. Chun* (2009) 45 Cal.4th 1172, 1205 [91 Cal.Rptr.3d 106, 203 P.3d 425] (*Chun*); see *Hedgpeth v. Pulido* (2008) 555 U.S. ___ [172 L.Ed.2d 388, 129 S.Ct. 530] (per curiam) [when the jury was instructed on both a valid and an invalid theory of guilt, the conviction will not be set aside if the invalid instruction was harmless].)

Similarly, although our conclusion defeats defendant's challenge to the burglary-murder special circumstance, we note that there is no reasonable possibility that the jury's findings on the burglary-murder special circumstance affected the penalty determination. (*People v. Morgan* (2007) 42 Cal.4th 593, 628 [67 Cal.Rptr.3d 753, 170 P.3d 129] (*Morgan*); see *Brown v. Sanders* (2006) 546 U.S. 212, 223–224 [163 L.Ed.2d 723, 126 S.Ct. 884].) The jury would have heard the same evidence regarding the killings, in proof of the prosecutor's theory of premeditated murder and the multiple-murder special circumstance, as it heard regarding the burglary-murder special circumstance. (*People v. Bonilla* (2007) 41 Cal.4th 313, 334 [60 Cal.Rptr.3d 209, 160 P.3d 84] [second special circumstance "was superfluous for purposes of death eligibility and did not alter the universe of facts and circumstances to which the jury could accord . . . weight"].)

with the intent to assault only one victim, or also intended to assault another person, the homicide victim. As illustrated by *Gutierrez, supra,* 28 Cal.4th 1083, a defendant who enters with the intent only to assault the homicide victim may not be convicted of felony murder, but a defendant who also harbors an intent to commit a less serious felony may be found guilty of felony murder in connection with the intended assault.

In addition to these analytical anomalies, we note that our recent opinion in *Chun, supra,* 45 Cal.4th 1172, which analyzed the basis of the second degree felony-murder rule, has highlighted the difference between the sources of the second degree felony-murder rule—the context in which the merger doctrine developed—and the first degree felony-murder rule. In *Chun,* we recognized that the second degree felony-murder rule reflects a judicial interpretation of section 188's definition of implied malice. Consequently, the merger doctrine developed as a judicial interpretation of section 188. This clarification raises the question of whether *Wilson*'s application of the merger doctrine in the context of first degree felony murder is an appropriate "interpretation" of section 189's definition of first degree felony murder. For the reasons set forth below, we conclude that *Wilson, supra,* 1 Cal.3d 431, erred in extending the merger doctrine to first degree felony murder.[23]

 "The [felony-murder] rule has two applications: first degree felony murder and second degree felony murder. . . . First degree felony murder is a killing during the course of a felony specified in section 189, such as rape,

---

[23] Our holding in *Wilson, supra,* 1 Cal.3d at page 440, was rejected by New York (*People v. Miller* (1973) 32 N.Y.2d 157 [344 N.Y.S.2d 342, 297 N.E.2d 85, 87, fn. 3] (*Miller*)), and subsequently was rejected by numerous other jurisdictions, rendering it a minority rule. (See *People v. Lewis* (Colo.Ct.App. 1989) 791 P.2d 1152, 1153 [court observed a "majority of jurisdictions hold that a burglary charge premised on an underlying crime of assault may sustain a finding of felony murder," and expressly declined to follow *Wilson*]; *Blango v. U.S.* (D.C. 1977) 373 A.2d 885, 888–889 [court expressly agreed with *Miller*'s reasoning, and rejected the holding of *Wilson*]; *State v. Foy* (1978) 224 Kan. 558 [582 P.2d 281, 289] [court expressly concluded *Miller*'s reasoning is persuasive, rejected *Wilson*, and held that the "merger doctrine does not apply in felony-murder cases where an aggravated burglary is based upon an aggravated assault"]; *Finke v. State* (1983) 56 Md.App. 450 [468 A.2d 353, 369] [rejecting *Wilson* on the ground that Maryland felony-murder statute expressly includes "murder committed in the perpetration of daytime housebreaking," and such burglary "includes breaking a dwelling house 'with intent to commit murder or felony therein' "]; *Commonwealth v. Claudio* (1994) 418 Mass. 103 [634 N.E.2d 902, 905–907] [court observed that *Wilson* was the "minority view," and concluded that *Miller* and other cases following the majority view were "better reasoned"]; *Smith v. State* (Miss. 1986) 499 So.2d 750, 753–754 [court declined to adopt the merger doctrine after discussing *Wilson* and observing that *Miller* "aptly states this Court's view regarding the application of our felony-murder statute"]; *State v. Contreras* (2002) 118 Nev. 332 [46 P.3d 661, 662–664] [court discussed *Wilson* and *Miller,* and held the merger doctrine did not apply to "felony murder when the underlying felony is burglary, regardless of the intent of the burglary"]; *State v. Reams* (1981) 292 Ore. 1 [636 P.2d 913, 919–920] [court discussed *Miller* and *Wilson,* and expressly rejected *Wilson*'s "logic" as applied to Oregon's felony-murder and burglary statutes].)

burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . .' [Citation.]" (*Chun, supra,* 45 Cal.4th at p. 1182.) The source of the second degree felony-murder rule has been questioned over the years, with some members of this court expressing concern that the rule lacked a statutory basis. (*Id.* at pp. 1182–1183.) We resolved the issue in *Chun,* in which we explained that the second degree felony-murder rule "is simply another interpretation of section 188's 'abandoned and malignant heart' language" (*id.* at p. 1184) and, therefore, is based upon statute[24] (*Chun,* at p. 1188).

 *Chun*'s identification of the statutory basis of the second degree felony-murder rule focuses our inquiry upon the statutory basis of the first degree felony-murder rule. Section 189 provides in relevant part that "[a]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, . . . is murder of the first degree." As we recently reiterated, " 'It is the duty of this court in construing a statute to ascertain and give effect to the intent of the Legislature.' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1048 [77 Cal.Rptr.3d 226, 183 P.3d 1199].) "We begin with the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1216 [78 Cal.Rptr.3d 272, 185 P.3d 708].)

 We find no ambiguity in the language of section 189. It provides that a killing committed in the perpetration of or attempt to perpetrate the enumerated felonies, including burglary, is first degree murder. Burglary has been a delineated felony supporting first degree felony murder since section 189 was enacted in 1872,[25] and indeed since the crime of murder was divided into first and second degree in 1856. (Stats. 1856, ch. 139, § 21, p. 219; see *Chun, supra,* 45 Cal.4th at p. 1185.) In enacting section 189, the Legislature did not limit the definition of burglary, or exclude burglaries based upon an intent to assault. Rather, section 189 applies the felony-murder rule to *all* burglaries. Under section 459, also enacted in 1872, burglary is committed when the defendant "enters any [defined structure] with intent to commit

---

[24] Section 188 states that malice, which is an element of murder (§ 187), "is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

[25] The Penal Code enacted in 1872 was "not published as part of the Statutes of 1871–1872," and was not given a chapter number. (Kleps, *The Revision and Codification of Cal. Statutes 1849–1953* (1954) 42 Cal. L.Rev. 766, 775.)

grand or petit larceny or *any* felony," including assault. (§ 459,[26] italics added; see *People v. Seaton* (2001) 26 Cal.4th 598, 646 [110 Cal.Rptr.2d 441, 28 P.3d 175] ["intent to unlawfully kill or to commit felonious assault" will sustain a burglary conviction].) Thus, nothing in the language of section 189 supports the application of the merger doctrine to its terms.

█ We repeatedly have observed that " ' "the power to define crimes and fix penalties is vested exclusively in the legislative branch." (*Keeler* v. *Superior Court*[ (1970)] 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617] . . . ; [citations].)' " (*Chun, supra*, 45 Cal.3d at p. 1183.) The courts may not *expand* the Legislature's definition of a crime (*Keeler v. Superior Court, supra*, 2 Cal.3d at p. 632), nor may they *narrow* a clear and specific definition. █ In the context of second degree felony murder, courts must interpret section 188's reference to an " ' "abandoned and malignant heart.' " (*Chun, supra*, 45 Cal.4th at p. 1181.) In the context of first degree felony murder, however, there is no need for interpretation of the Legislature's clear language. Thus, the differences between the statutory bases for first and second degree felony murder support the conclusion that although this court properly may limit the breadth of second degree felony murder in a manner consistent with its interpretation of the Legislature's intent, there is no room for interpretation when the Legislature has defined first degree felony murder to include any killing "committed in the perpetration of, or attempt to perpetrate, . . . burglary." (§ 189.)

Because the power to define crimes lies exclusively with the Legislature, our decision in *Wilson, supra*, 1 Cal.3d 431, erred in narrowing the Legislature's clear and specific definition of first degree murder. In *Wilson*, we expressed the view that "[w]here a person enters a building with an intent to assault his victim with a deadly weapon, he is not deterred by the felony-murder rule." (*Id.* at p. 440.) Although we recognized that crimes committed inside structures entail greater risks to the occupants, we concluded that "this rationale does not justify application of the felony-murder rule to the case at bar. Where the intended felony of the burglar is an assault with a deadly weapon, the likelihood of homicide from the lethal weapon is not significantly increased by the site of the assault." (*Id.* at pp. 440–441.) Finally, we concluded that the burglary statute "includes within its definition numerous structures other than dwellings as to which there can be no conceivable basis for distinguishing between an assault with a deadly weapon outdoors and a

---

[26] As enacted in 1872, section 459 provided: "Every person who, in the night-time, forcibly breaks and enters, or without force enters through any open door, window, or other aperture, any house, room, apartment, or tenement, or any tent, vessel, water craft, or railroad car, with intent to commit grand or petit larceny, or any felony, is guilty of burglary."

burglary in which the felonious intent is solely to assault with a deadly weapon."[27] (*Wilson*, at p. 441, fn. omitted.)

We disagree with *Wilson*'s view that applying the felony-murder rule to a killing committed in the course of a burglary, with an intent to assault, serves no purpose. First, a person who enters a building with the intent to assault, rather than to kill (in which case the felony-murder rule would be unnecessary), may be deterred by the circumstance that if the victim of the assault dies, the burglar "will be deemed guilty of first degree murder." (*People v. Burton* (1971) 6 Cal.3d 375, 388 [99 Cal.Rptr. 1, 491 P.2d 793].) Second, the circumstance that *the degree* to which the peril is heightened may vary, depending upon the particular structure in which the assault occurs, does not negate the purpose of deterring assaults and the heightened risks entailed by assaults that are committed within structures. Individuals within any type of structure are in greater peril from those entering the structure with the intent to commit an assault, than are individuals in a public location who are the target of an assault. (*Miller, supra*, 297 N.E.2d at p. 87.) Victims attacked in seclusion have fewer means to escape, and there is a diminished likelihood that the crimes committed against them will be observed or discovered. These risks are present regardless of whether the burglary and assault occur in a home, a tent, or a trailer coach. (See *ante*, fn. 27.) For these reasons, we reject *Wilson*'s conclusion that no purpose is served by applying the felony-murder doctrine to a burglary premised upon an intent to assault.

 Defendant contends, however, that the Legislature's failure to amend section 189 in response to *Wilson*, despite having amended the statute in other respects, demonstrates that this body is not "troubled by this Court's merger jurisprudence." "[W]e frequently have expressed reluctance to draw conclusions concerning legislative intent from legislative silence or inaction." (*People v. Cruz* (1996) 13 Cal.4th 764, 784 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Here, although the Legislature has not "affirmatively disapproved" this court's analysis in *Wilson*, neither has defendant established that the Legislature has either "expressly or impliedly endorsed it." (*People v. Escobar* (1992) 3 Cal.4th 740, 751 [12 Cal.Rptr.2d 586, 837 P.2d 1100].) As we observed in *People v. King* (1993) 5 Cal.4th 59, 77 [19 Cal.Rptr.2d 233, 851 P.2d 27], when this court has created a rule, we can reexamine it. The circumstance that we have misconstrued the statutory scheme in the aftermath of our 1969 decision in *Wilson* does not justify continuing to ignore the Legislature's apparent intent in enacting section 189.

---

[27] *Wilson* noted that the burglary statute includes "any 'shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, trailer coach . . . , vehicle . . . , aircraft . . . , mine or any underground portion thereof . . . .' (Pen. Code, § 459.)" (*Wilson, supra*, 1 Cal.3d at p. 441, fn. 3.) As noted above, the statute included a broad array of structures when it was enacted in 1872. (See *ante*, fn. 26.)

Defendant also contends that by applying the merger doctrine to second degree, but not first degree, murder, this court is "sanctioning more severe punishment[] for less culpable conduct." As a preliminary matter, we reject defendant's premise that the insidiousness of an entry committed with the intent to commit an assault does not merit more severe punishment than a simple assault. In any event, as explained above, it is for the Legislature, not this court, to determine penalty. "This court has reiterated numerous times that 'The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit.' (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof." (*People v. Burton, supra*, 6 Cal.3d at p. 388.) Policy concerns regarding the inclusion of burglary in the first degree felony-murder statute remain within the Legislature's domain, and do not authorize this court to limit the plain language of the statute. Therefore, we overrule our decision in *People v. Wilson, supra*, 1 Cal.3d 431.

 Because, due to ex post facto concerns, an unforeseeable judicial enlargement of a criminal statute may not be applied retroactively, our overruling of *Wilson* does not apply retroactively to defendant's case. (*People v. Blakeley* (2000) 23 Cal.4th 82, 91–92 [96 Cal.Rptr.2d 451, 999 P.2d 675] [conclusion, contrary to Court of Appeal opinions, that a killing in imperfect self-defense is voluntary, not involuntary, manslaughter, is prospective only, due to ex post facto concerns]; *People v. Morante* (1999) 20 Cal.4th 403, 430–432 [84 Cal.Rptr.2d 665, 975 P.2d 1071] [similar conclusion regarding an expansive reinterpretation of Pen. Code, § 182]; *People v. Martinez, supra*, 20 Cal.4th at pp. 238–241 [overruling of *People v. Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274] (regarding the asportation element of kidnapping) is prospective only, for similar reasons]; *People v. Davis* (1994) 7 Cal.4th 797, 811–812 [30 Cal.Rptr.2d 50, 872 P.2d 591] [holding, contrary to Court of Appeal opinions, that viability of a fetus is not an element of fetal murder, is prospective only, for similar reasons]; *People v. King, supra*, 5 Cal.4th at pp. 79–80 [overruling of *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23] regarding firearm use enhancement is prospective only, for similar reasons]; see also *Rogers v. Tennessee* (2001) 532 U.S. 451, 462 [149 L.Ed.2d 697, 121 S.Ct. 1693]; *Bouie v. City of Columbia* (1964) 378 U.S. 347, 353 [12 L.Ed.2d 894, 84 S.Ct.

1697].) *Wilson, supra,* 1 Cal.3d 431, was decided in 1969. Defendant committed his crimes in 1988, at which time it was unforeseeable that we would overrule *Wilson.* Accordingly, today's overruling is prospective only. Of course, in light of the conclusion we reach under our jurisprudence governing at the time of the crimes—that the burglary committed with the intent to assault Black did not merge with the homicides—there was no error in instructing the jury concerning felony murder premised upon that burglary.

### b. *Instructions on reasonable doubt and circumstantial evidence*

Defendant asserts that the trial court's instructions concerning reasonable doubt violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. The trial court instructed the jury in the language of former CALJIC 2.90.[28] The high court upheld the language of this instruction in *Victor v. Nebraska* (1994) 511 U.S. 1, 13, 15, 17 [127 L.Ed.2d 583, 114 S.Ct. 1239], and we have held that it was not error to give the instruction. (*People v. Freeman* (1994) 8 Cal.4th 450, 503 [34 Cal.Rptr.2d 558, 882 P.2d 249] (*Freeman*).) Defendant provides no persuasive reason to revisit these conclusions.

■■■ Defendant further contends that the instruction concerning reasonable doubt was improper when given in conjunction with the instruction that if "one interpretation of [the] evidence appears to you to be reasonable, and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." A similar instruction was given with regard to the existence of required specific intent. We repeatedly have rejected claims that these instructions allow a finding of guilt based upon a degree of proof less than reasonable doubt, establish "an 'impermissible mandatory presumption' " of guilt, or impose upon defendant a burden of proof. (*Morgan, supra,* 42 Cal.4th at p. 620; see *People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) "The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt." (*People v. Jennings* (1991) 53 Cal.3d 334, 386 [279 Cal.Rptr. 780, 807 P.2d 1009].)

---

[28] The jury was instructed: "Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

c. *Requested defense instructions*

Defendant contends the trial court's denial of certain instructions he requested violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Defendant requested the following instruction: "If you find that a witness has testified falsely, this fact may afford an inference that the witness is concealing the truth, but it does not, by itself, warrant an inference that the truth is the direct opposite of the rejected testimony." This instruction was properly rejected as argumentative and duplicative of other given instructions.[29] (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224] (*Gurule*).)

Defendant requested a modified instruction concerning reasonable doubt. We have cautioned "against trial court experimentation" with this instruction, and as noted earlier, we have upheld the validity of the instruction given by the court. (*Freeman, supra*, 8 Cal.4th at p. 504.) Defendant's proposed instruction was duplicative of instructions that were given, and thus was properly refused. (*Gurule, supra*, 28 Cal.4th at p. 659.)

Defendant also requested an instruction providing: "An abiding conviction is a belief with staying power. Even absolute positivism, if it wanes after some undetermined and undeterminable time, is insufficient. Therefore, not just any kind of conviction will dispel a reasonable doubt, it must be the abiding kind only." We previously have held that this language is not required. (*People v. Turner* (1994) 8 Cal.4th 137, 203 [32 Cal.Rptr.2d 762, 878 P.2d 521] (*Turner*), overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

Defendant requested additional instructions defining "deliberate" and "premeditate," and three instructions that elaborated on the concept of premeditation. The jury was instructed in the language of CALJIC No. 8.20. That was sufficient. (*People v. Moon* (2005) 37 Cal.4th 1, 31–32 [32 Cal.Rptr.3d 894, 117 P.3d 591]; *Gurule, supra*, 28 Cal.4th at p. 659.)

4. *Alleged cumulative error*

Defendant asserts that even if the errors alleged above are not in themselves reversible, their cumulative effect requires reversal. We disagree. As

---

[29] The jury was instructed in the language of CALJIC No. 2.21.2, which provides: "A witness, who is willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

explained above, defendant was not prejudiced by the exclusion of evidence intended to impeach Hirst, by the exclusion of defendant's letters as evidence of his state of mind, or by any flaws in the felony-murder instructions. The few errors that may have occurred during defendant's trial were harmless under any standard, whether considered individually or collectively. Defendant "has merely shown that his ' "trial was not perfect—few are." ' " (*People v. Cooper* (1991) 53 Cal.3d 771, 839 [281 Cal.Rptr. 90, 809 P.2d 865].)

## C. *Penalty phase issues*

### 1. *Data concerning past employment*

Defendant contends the trial court erred in denying him access to data concerning his past employment, and in prohibiting him from introducing evidence on that subject, in violation of the Eighth Amendment to the United States Constitution, and that the error mandates reversal of the penalty imposed.[30]

#### a. *Factual background*

Because defendant had access to classified information during his employment in the Navy and at ESL, the federal government expressed concern before and during trial that defendant would disclose confidential information at trial. At a hearing held before defendant testified at the guilt phase of the trial, Robin Ball, an attorney from the United States Department of Justice, sought to assert a privilege on behalf of the federal government, proposing that, at defendant's trial, he be permitted either to rise and object, or signal the court or the prosecutor that he wished to assert a claim of privilege. The trial court rejected the view that the federal government had standing to intervene in these proceedings, and could not conceive of any scenario in which Ball would be permitted to raise an objection before a capital case jury, but the court was not opposed to an arrangement between the prosecutor and Ball by which Ball might communicate concerns to the prosecutor. The following day, although the prosecutor also questioned the assertion that the federal government had standing to object, he informed the court and defense counsel that "[t]here will however be some mechanism where . . . Mr. Ball can communicate with me at appropriate times. I will make any objections that the prosecution feels necessary." He subsequently added, "I'm not nor do I intend to be an agent for the U.S. Government. My interests are prosecuting murder."

---

[30] Defendant also filed a motion for new trial raising this issue.

During defendant's guilt phase testimony, the trial court sustained several objections by the prosecution on the ground of relevancy. Defendant claims error with respect to four questions he was asked but was not allowed to answer.

First, defendant testified that following his return from Australia, he "found a position working for a subset of a piece of equipment that we had deployed over in Australia." Defense counsel asked him to explain what he meant by "a subset of the equipment that had been deployed." The prosecutor objected on relevancy grounds, which the trial court sustained. At a sidebar conference, defense counsel asked whether the objection had been made in response to a signal from the representative of the federal government, and the prosecutor stated he had "no idea," and had objected because the question was irrelevant. Defense counsel stated he was attempting to elicit testimony (1) to counter prosecution testimony regarding the ESL location where defendant was assigned, as opposed to the location where he in fact was seen working (and by implication, stalking Black), and (2) to elucidate defendant's "industry jargon" so that the jury understood "what it is he was working on." The trial court suggested counsel simply ask defendant where that piece of equipment was located.

Second, when defendant testified that he was assigned to a different project, defense counsel asked him to identify the new project. The prosecutor's objection on the ground of relevancy was sustained. At sidebar, defense counsel again inquired whether the prosecutor's objection was prompted by a signal from Ball. After colloquy between counsel and the court, the prosecutor said, "When I make a relevancy objection, I mean that the matter is irrelevant. Pure and simple." After further argument, the court again stated that "[t]he relevancy is where he was working."

Third, defendant testified that he did not believe the actions he took to gather information about Black were wrong, because his Navy career and his work at ESL fostered an attitude that gathering information surreptitiously was not wrong and that information was power. Defense counsel asked, "What are you referring to in terms of what you did in the military and ESL that fostered these attitudes?" The prosecutor objected that the information was irrelevant. At a sidebar conference, defense counsel suggested Ball had signaled the prosecutor. The prosecutor stated, "I received no signal. I made a relevance objection." After further discussion between the court and counsel, the court asked defendant for an offer of proof regarding what defendant "is going to testify to." After consultation with defendant, defense counsel stated defendant would testify that his work involved the use of "electronic methods to monitor electronic signals generated by foreign powers," and he "intend[ed] to ask [defendant] about that information, about where it was

coming from, and why this work contributed to his attitudes, what it was about that that contributed to his attitudes . . . ." After further argument by counsel, the court sustained the objection, noting that defendant already had testified that his military and work environment, in which he possessed security clearances that allowed him to obtain information, had led to his "feeling of power from getting information." The trial court explained that it "fail[ed] to see what he did specifically in the Navy or at ESL insofar as particular projects that he worked on, or particular discussion about monitoring electronic signals of foreign powers or as well as any agencies that he worked for, how that has anything at all to do with this." The court added that "even if it had some marginal relevance under 352, this is a complete waste of time, confusion of the issues, and the probative value of this information is negligible."

Fourth, after defendant testified further about the attitudes fostered by being involved in spying, and about his "elite" feeling from having access to classified information, defense counsel asked about the type of information gathered in the Australian facility where defendant worked. The trial court sustained the prosecutor's relevancy objection, and added that the testimony had "no probative value" and was time consuming. The court stated: "I think you have beat to death the issue of spying equals power equals information equals power, that this Defendant has established those attitudes from his work in the military and at ESL, and that he has already described his attitudes about that and that the fact that normal people don't have this information, that he's elitist because he had all this information because of his super secret clearance. Enough is enough."

Before the defense completed its direct examination of defendant, it was afforded a hearing regarding Ball's signals to the prosecutor. Ball testified that he would wave to Lieutenant Dow if a question or answer raised privileged matters. With respect to two questions, Ball stated he had waved to Dow, but the prosecutor already had stood up to object in each instance. With respect to another question, Ball said he waved to Dow and Dow touched the prosecutor's arm. Lieutenant Dow testified that the prosecutor stated that he was "already aware" and was about to object. Thus, the prosecutor did not in fact make any objections at the prompting of the federal representative.

The confidential nature of defendant's work in the Navy and at ESL also resulted in limitations upon the testimony of Kent Wells, the Navy personnel security specialist, during the penalty phase. The trial court ruled in limine that it could not order Wells to disclose classified information, because doing so could subject him to criminal prosecution. It also concluded the confidential information defendant sought from Wells was not necessary, because the defense was "making [its] point before the [j]ury with other evidence."

Defendant requested that Wells testify outside the presence of the jury, be ordered to answer questions involving confidential information, and thereby be forced to invoke a privilege. The trial court agreed. As relevant here, Wells refused to disclose what information was gathered by the national security function with which defendant was involved, but agreed that defendant, as a member of the team, "helped gather information which was essential to national security, search and rescue and navigational assistance." The trial court found "[t]he gathering function itself . . . to be irrelevant." Wells also testified that knowing the location of ships, planes, and other kinds of objects is important in defending the United States against its enemies, and that defendant thereby contributed to the country's national security, but he refused to explain "[w]hat type of enemy movements, activities, were being monitored that was of assistance to the United States in its defense." The trial court concluded that the "type of enemy movements" was irrelevant. Finally, Wells testified that in the course of repairing and maintaining the equipment, defendant may have been exposed to information stored in computers, but declined to disclose whether the equipment contained specific information about submarine activities of enemy fleets. The trial court found this information to be irrelevant, and also found that the inquiry would result in an undue consumption of time and would confuse the jury. (Evid. Code, § 352.)

b. *Discussion*

Defendant contends the trial court's rulings give rise to several related questions: (1) In a capital case, does the defendant have a constitutional right to obtain and present mitigating evidence even if it is protected by a national security privilege? (2) If the defendant is denied the right to present such mitigating evidence, can the state nonetheless seek the death penalty on the theory that it is not the state, but the federal government, that is withholding the evidence? (3) In a capital case, can the court exclude details of a defendant's employment as irrelevant?

Defendant does not argue there was error either in the trial court's rulings concerning the discovery of classified information or his motion to bar the death penalty, or in the federal court's grant of summary judgment with respect to defendant's Freedom of Information Act complaint. His argument focuses instead upon the trial court's rulings concerning relevance and the exclusion of evidence under Evidence Code section 352 during defendant's and Wells's testimony, and the "signaling" system between the prosecutor and Ball, representing the United States Government. Moreover, as defendant acknowledges, during the presentation of evidence there were no objections or rulings on the basis of national security. Therefore, the first two issues identified by defendant are not presented.

 We turn to the third issue—whether a court, in a capital case, may exclude details of a defendant's employment as irrelevant. "The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*Frye, supra,* 18 Cal.4th at p. 1015.) "Nonetheless, the trial court still ' "determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' " (*People v. Williams* (2006) 40 Cal.4th 287, 320 [52 Cal.Rptr.3d 268, 148 P.3d 47]; see *Romano v. Oklahoma* (1994) 512 U.S. 1, 12 [129 L.Ed.2d 1, 114 S.Ct. 2004] ["The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings."]; *Lockett v. Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 98 S.Ct. 2954] ["Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."].) "The meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" from what it is in any other context. (*McKoy v. North Carolina* (1990) 494 U.S. 433, 440 [108 L.Ed.2d 369, 110 S.Ct. 1227].) Thus, " '[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.' " (*Ibid.*; see Evid. Code, § 210.)

Defendant contends that the "trial court's repeated relevancy rulings favoring the prosecution were nothing more than a subterfuge," and that the court's "implicit goal was to avoid having to rule on an assertion of a national security privilege." He also contends Evidence Code section 352, upon which the court relied in several of its rulings, was inapplicable because the information sought was not prejudicial, and would have taken little time to present.

We first consider the rulings made during defendant's testimony. Defendant testified only at the guilt phase. Thus the challenged trial court rulings regarding his testimony are examined not in the context of his attempt to adduce penalty phase mitigating evidence, as defendant contends, but rather as evidence proffered in defense of the charged offenses. Defendant's testimony regarding his work assignments was relevant to counter the implication that he left his assigned work area in order to stalk Black. Therefore, evidence establishing that he was assigned to work in areas where Black was assigned was relevant, but the precise project upon which defendant was working, or a more detailed description of the equipment used, was not. Similarly, evidence indicating that defendant felt entitled to invade the

privacy of others because of his military and ESL experience arguably was relevant to his state of mind, but the content of the classified information that he helped gather was not. The court's rulings concerning relevance and the exclusion of evidence under Evidence Code section 352 were well within the court's broad discretion and do not demonstrate, contrary to defendant's assertion, that the "trial court was acting in concert with the prosecution and the United States Attorney's office . . . to ensure" that the basis for the exclusion was not national security.

With respect to the signaling system set up between the prosecutor and Ball, defendant contends that the state "actively collaborat[ed] with the federal government to withhold mitigating evidence from the jury." He claims the signaling system deprived him of his Sixth, Eighth, and Fourteenth Amendment rights, because it masked the true basis for the objections, that is, national security, and thereby denied him the opportunity to seek meaningful appellate review of the real basis "for the exclusion of this critical evidence." Once again, these events occurred during the guilt phase, at a time when defendant was not proffering mitigating evidence. In addition, the record indicates the signals did not lead to any objections; rather, the prosecutor was objecting or preparing to object when the signals were received.

Nor did the trial court's challenged rulings regarding Wells's testimony, during the penalty phase, improperly limit the admission of mitigating evidence. The evidence presented fully informed the jury that defendant received a top-security clearance requiring that he be trustworthy, reliable, of unquestioned character, and loyal to the United States; he worked on a high frequency direction-finding network that assisted in search and rescue missions for aircraft or ships in distress; enemy location was one aspect of the information defendant would gather; the Secretary of Defense characterized all of the projects that defendant worked on as vital to the national defense; and much of his work remained classified at the time of trial. The precise information gathered, the type of enemy movements monitored, and whether the equipment contained information about the submarine activities of enemy fleets, was tangential and had no bearing upon defendant's character or record, or the circumstances of his crimes.

### 2. *Alleged improper limitation upon closing argument*

Defendant contends the trial court erred by prohibiting defense counsel from arguing that defendant's crimes were less serious than those of other

capital defendants, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.[31] No error appears.

During closing argument, defense counsel stated, "We need to look at this case and compare this case with other special circumstance killings . . . ." At a sidebar conference, defense counsel repeatedly asserted he did not "intend to comment on what case got what penalty." Rather, counsel sought to argue that "this is not . . . the worst of the worst . . . , there are far worse cases," by referring to such defendants as Richard Ramirez, David Carpenter, and Ramon Salcido, and discussing the circumstances of their crimes.

The court ruled that counsel would "not be permitted to engage in a comparative analysis of other death penalty cases or other murder cases . . . ." Counsel was not allowed to mention "specific cases, specific names, specific penalties," but he was permitted to say that "this is not a child torture case or something like that." Following the sidebar conference, defense counsel argued to the jury that defendant, whose crimes involved a single incident brought on by severe emotional and personal stress and who did not kill as many individuals as he might have or seize hostages, was less deserving of the death penalty than a person who kills with the thought of avoiding capture, tortures victims, acts for mercenary reasons, or kills on multiple occasions over a long period of time.

Defendant now contends "[t]he fact that a particular defendant's crime is less aggravated than the crimes of others who have received the death penalty—or especially that it is less aggravated than the crimes of persons who did not receive the death penalty—is nonetheless a proper consideration for the sentencing body in deciding what sentence to impose." As set forth above, however, trial counsel repeatedly stated he did not seek to refer to the penalty imposed in any particular case. Therefore, this claim is forfeited.

Defendant's claim also is without merit. On numerous occasions, we have upheld a trial court's refusal "to allow defense counsel to compare the subject crime to other well-known murders" (*People v. Hughes* (2002) 27 Cal.4th 287, 400 [116 Cal.Rptr.2d 401, 39 P.3d 432]), or to note the penalty imposed in such cases (*People v. Sakarias* (2000) 22 Cal.4th 596, 640 [94 Cal.Rptr.2d 17, 995 P.2d 152]), while allowing argument that there "were other murderers worse than he" (*People v. Benavides* (2005) 35 Cal.4th 69, 110 [24 Cal.Rptr.3d 507, 105 P.3d 1099]). "[M]eaningful comparisons with other well-publicized crimes cannot be made solely on the basis of the circumstances of the

---

[31] As we previously have observed, a claim that defense counsel's argument improperly was limited invokes an aspect of the right to counsel. (*People v. Marshall* (1996) 13 Cal.4th 799, 854 [55 Cal.Rptr.2d 347, 919 P.2d 1280] (*Marshall*).) Hence, it is grounded in the Sixth, not the Eighth, Amendment.

crime . . . without consideration of the other aggravating and mitigating circumstances." (*People v. Roybal* (1998) 19 Cal.4th 481, 529 [79 Cal.Rptr.2d 487, 966 P.2d 521]; see *Marshall, supra,* 13 Cal.4th at pp. 854–855.) Here, counsel's central point was that defendant's murders were not "the worst of the worst." He was not precluded from making such an argument, and ably did so.

### 3. *Alleged instructional error*

Defendant contends the trial court erred in refusing to give three proposed instructions concerning aggravating and mitigating circumstances. We disagree.

The first and second paragraphs of the first proposed instruction defined aggravating and mitigating circumstances, and therefore were duplicative of CALJIC No 8.88, which was given here, and which likewise defines aggravating and mitigating circumstances. Hence the trial court properly declined to give this portion of the proposed instruction. (*Gurule, supra,* 28 Cal.4th at p. 659.)

The third paragraph of the first proposed instruction provided: "The fact that [defendant] has been found guilty beyond a reasonable doubt of the crime of murder in the first degree is not itself an aggravating circumstance." We previously have rejected a claim that a trial court erred in refusing to give a substantially similar instruction. (*People v. Coleman* (1989) 48 Cal.3d 112, 152–153 [255 Cal.Rptr. 813, 768 P.2d 32] (*Coleman*).) We observed: "The request was properly denied since the requested instruction was unnecessary and possibly misleading. There appeared no need to tell the jury that the murder conviction in the abstract, as distinct from the circumstances of the murder, is not an aggravating factor since no one had suggested otherwise. More seriously, the requested instruction might have been understood as a contradiction of the instruction properly given, that the jury should consider the statutory aggravating and mitigating factors, including the 'circumstances of the crime of which the defendant was convicted in the present proceeding' (§ 190.3, factor (a))." (*Id.* at pp. 152–153.)

Defendant's second proposed instruction provided: "You may not treat the verdict and finding of first degree murder committed under [a] special circumstance[s], in and of themselves, as constituting an aggravating factor. For, under the law, first degree murder committed with a special circumstance may be punished by either death or life imprisonment without [the] possibility of parole. [¶] Thus, the verdict and finding which qualifies a particular crime for either of these punishments may not be taken, in and of themselves, as justifying one penalty over the other. You may, however, examine the

evidence presented in the guilt and penalty phases of this trial to determine how the underlying facts of the crime bear on aggravation or mitigation."

As with defendant's first proposed instruction, this instruction was unnecessary and possibly misleading. The trial court instructed the jury to "consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances," and explained that "[a]n aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself." The court also instructed the jury that it could consider "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true," but the jury could not consider both the existence of a special circumstance and the facts underlying the special circumstance. "In other words, do not consider the same factors more than once in determining the presence of aggravating factors." Also, like defendant's proposed instruction, an instruction given by the court explained that the penalty for a defendant who has been found guilty of murder in the first degree in a case in which a special circumstance has been found true is death or life imprisonment without the possibility of parole. These instructions adequately conveyed to the jury that it was required to consider the facts underlying the convictions and special circumstance findings, not the mere existence of the convictions and findings. Defendant's proposed instruction was misleading to the extent it contradicted instructions directing the jury to consider the circumstances of the crime and the existence of any special circumstance. (See *Coleman, supra*, 48 Cal.3d at pp. 152–153.)

The third proposed instruction provided: "In deciding whether you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact which was used by you in finding him guilty of murder in the first degree or which was used by you in establishing the existence of any special circumstances which you have found to be true unless that fact establishes something in addition to an element of the crime of murder in the first degree. The fact that you have found [defendant] guilty beyond a reasonable doubt of the crime of murder in the first degree is not itself an aggravating circumstance." This instruction properly was refused, because it was erroneous and misleading. (*Coleman, supra*, 48 Cal.3d at pp. 152–153.) As noted above, the jury properly was instructed pursuant to section 190.3, factor (a), that it could consider "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." Moreover, as noted above, the jury was instructed not to "double-count."

### 4. *Constitutionality of death penalty statute*

Defendant makes numerous claims that the death penalty statute violates the United States Constitution. For the reasons set forth below, we conclude there is no merit in these contentions.

Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment. (*People v. Zamudio* (2008) 43 Cal.4th 327, 373 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

Section 190.3, factor (a), which allows the jury to consider, in choosing the appropriate penalty, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," does not violate the Eighth or Fourteenth Amendments to the United States Constitution merely because those circumstances differ from case to case, or because factor (a) does not guide the jury in weighing these circumstances. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978–979 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Stevens* (2007) 41 Cal.4th 182, 211 [59 Cal.Rptr.3d 196, 158 P.3d 763] (*Stevens*).)

The absence of a requirement that the state prove beyond a reasonable doubt that aggravating factors are true (except for other, unadjudicated crimes), that aggravating factors outweigh mitigating factors, and that death is the appropriate punishment, does not render the death penalty statute unconstitutional under the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*People v. Cox* (2003) 30 Cal.4th 916, 971 [135 Cal.Rptr.2d 272, 70 P.3d 277] (*Cox*), disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) "Nor is there merit to defendant's alternative claim that a preponderance of the evidence standard of proof is compelled for the findings that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence," or that the jury should be instructed that there is no burden of proof. (*Stevens, supra,* 41 Cal.4th at p. 212.) The jury was instructed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." That is sufficient. (*Tuilaepa v. California, supra,* 512 U.S. at p. 979; *Stevens,* at p. 212.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d

435, 120 S.Ct. 2348], or *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], affects our conclusions in this regard. (*Stevens, supra,* at p. 212; *Cox, supra,* at pp. 971–972.)

The absence of any requirement that the jury make written findings with respect to which aggravating evidence is true, and that the findings be unanimous, does not deny due process or violate the Eighth Amendment right to meaningful review. (*Stevens, supra,* 41 Cal.4th at p. 212.)

Contrary to defendant's arguments, the use of the words "extreme" in section 190.3, factors (d) and (g), and "substantial" in factor (g), does not render these factors unconstitutionally vague, arbitrary, or capricious, nor does it act as a barrier to the consideration of mitigating evidence or violate the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*Stevens, supra,* 41 Cal.4th at p. 213.) The instructions in this case concerning section 190.3, factor (k), which were consistent with our guidance in *People v. Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], allowed consideration of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See *Ayers v. Belmontes* (2006) 549 U.S. 7, 15 [166 L.Ed.2d 334, 127 S.Ct. 469]; *Boyde v. California* (1990) 494 U.S. 370, 381–382 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

The failure to require intercase proportionality review by either the trial court or on appeal does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *Cox, supra,* 30 Cal.4th at p. 970.) Nor does the circumstance that intercase proportionality review is conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process. (*Turner, supra,* 8 Cal.4th at p. 209; *People v. Cox* (1991) 53 Cal.3d 618, 690–691 [280 Cal.Rptr. 692, 809 P.2d 351], disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

### 5. *Cumulative error*

Defendant contends that cumulative error committed at both the guilt and penalty phases requires reversal. We have found no error at the penalty phase. As explained above, defendant was not prejudiced by the exclusion of

evidence intended to impeach Hirst, by the exclusion of defendant's letters as evidence of his state of mind, or by any flaws in the felony-murder instructions. The few errors that may have occurred during defendant's trial were harmless under any standard, whether considered individually or collectively.

### III. Disposition

The judgment is affirmed in its entirety.

Baxter, J., Werdegar, J., Chin, J., Moreno, J., Corrigan, J., and Nicholson, J.,* concurred.

Appellant's petition for a rehearing was denied August 19, 2009. Kennard, J., did not participate therein.

---

*Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.